[Cite as *In re C.S.*, 2021-Ohio-3182.]

| | | |
|---|---|---|
| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

IN RE C.S.
     G.S.

C.A. Nos.    29927
                29929
                29938

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF SUMMIT, OHIO
CASE Nos.    DN 17 11 0948
                DN 19 01 0048

DECISION AND JOURNAL ENTRY

Dated: September 15, 2021

CALLAHAN, Judge.

{¶1} Appellants Mother, Father, and Grandfather appeal the judgment of the Summit County Court of Common Pleas, Juvenile Division, that terminated Mother's and Father's parental rights and placed their two children in the permanent custody of Summit County Children Services Board ("CSB" or "the agency"). This Court affirms.

I.

{¶2} Mother and Father are the biological parents of G.S. (d.o.b. 7/25/11) and C.S. (d.o.b. 11/9/17). Grandfather is the maternal grandfather of the children.

{¶3} These cases have a long and complicated history. When G.S. was an infant, CSB filed a complaint in juvenile court regarding the child. The details of that case are limited, but G.S. was ultimately returned to Mother's legal custody. Mother allowed G.S. to live in Grandfather's home, where Mother also lived at times. Although, in 2017, Grandfather moved

for legal custody of G.S. in the 2011 dependency case, no change of disposition was granted, and Mother remained the child's legal custodian. At no time was Grandfather appointed as a custodian or guardian for the child. The record indicates, however, that he possessed some sort of power of attorney regarding G.S.

{¶4} Late in 2017, a couple weeks after C.S. was born, CSB filed a complaint alleging that that child was abused (endangered) and dependent. In support, the agency alleged that Mother had used drugs throughout her pregnancy, that the infant exhibited signs of withdrawal and required treatment with morphine, that Father had both substance abuse and criminal histories, and that the parents' relationship was volatile. CSB obtained emergency temporary custody of C.S. The agency did not remove the then-six-year-old G.S. or file a complaint regarding that child at that time, because G.S. was then living in another home with Grandfather, a maternal aunt, and some cousins.

{¶5} Mother later stipulated that C.S. was abused (endangered) and dependent. As Father did not appear for adjudication, the agency presented evidence to establish C.S.' abuse and dependency. The child was then placed in the temporary custody of CSB. The juvenile court adopted the agency's case plan which required Mother to engage in chemical dependency services with an approved provider and follow all recommendations, including submitting to additional substance abuse and mental health assessments, attending counseling and relapse prevention or aftercare services, attending support meetings, and submitting to drug screens. Mother was also required to demonstrate that she had the resources to provide for the child's basic needs, including housing, food, clothing, and the like. Father was required to formally establish paternity and contact the caseworker if he was interested in visitation or custody.

Shortly after Father was determined to be C.S.' biological father, the agency added case plan objectives for him regarding chemical dependency and mental health services, and basic needs.

{¶6} After the first review hearing, C.S. was continued in the temporary custody of CSB. At that time, the magistrate's order expressly found that "[n]o appropriate or willing relatives have been identified for placement or custody at this time." When C.S. was 9 months old, the guardian ad litem filed a report indicating that Mother wanted Grandfather, in whose home G.S. was staying, to have legal custody of C.S. However, Grandfather had informed the guardian ad litem that he was not willing or able to seek custody of the infant.

{¶7} Eleven months into the case, CSB filed a motion for a first six-month extension of temporary custody. The agency asserted that "Kinship [department] previously assessed and denied [Grandfather], but an updated Kinship Assessment is pending. [Grandfather] is willing to take placement and to be a concurrent permanency plan." Accordingly, CSB asserted that an extension of temporary custody was in C.S.' best interest so that the agency had time to complete a second kinship assessment regarding Grandfather. At the sunset dispositional hearing, the juvenile court granted the agency's motion for a first six-month extension of temporary custody of C.S.

{¶8} A month and a half later in January 2019, CSB filed a complaint alleging three grounds that G.S. was a dependent child. The agency removed the child from the home he shared with Grandfather, a maternal aunt, and some cousins, after his aunt was found slumped over the steering wheel of her car in a school parking lot. The aunt evidenced symptoms of opiate overdose. There were suspicions of drug and excessive alcohol use in the home, as well. CSB alleged that the aunt had been trying to buy Vicodin for Grandfather who admitted using non-prescribed Vicodin for pain. Grandfather also admitted having had a beer before picking up

C.S. once from daycare. CSB alleged that the aunt was engaging in prostitution out of Grandfather's home. Grandfather denied this but admitted that the aunt gave massages to men in the home where G.S. and the aunt's young children were living. Mother informed the agency that she was also staying in Grandfather's home with G.S. at times. At the time of G.S.' removal, Mother and Father had made minimal progress on their case plan objectives to remedy the concerns that had caused the removal of G.S.' sister from Mother's and Father's custody. Mother and Father both stipulated to G.S.' dependency and his placement in the temporary custody of CSB.

{¶9} In April 2019, CSB moved for a second six-month extension of temporary custody of C.S. based on Mother's progress. Although Father had not made any progress, the juvenile court granted the second six-month extension of temporary custody based on Mother's additional substantial compliance with her case plan objectives. Two weeks later, G.S. was continued in the agency's temporary custody after a review hearing. Shortly thereafter, Mother requested and received unsupervised visitation with both children, provided that she not allow Father and/or Grandfather to be present.

{¶10} Almost immediately, Mother began to regress. She became financially dependent on Father, began missing counseling sessions, prioritized Father over the children, and brought both Father and Grandfather to her unsupervised visits. After the next review hearing, the magistrate maintained both children in the agency's temporary custody and ordered that Mother's visits thereafter would be supervised at the agency visitation center. The magistrate made the express finding that "[n]o appropriate or willing relatives have been identified for placement or custody at this time."

{¶11} On October 17, 2019, 23 months after filing its complaint regarding C.S. and nine months after filing its complaint regarding G.S., CSB filed a motion for permanent custody of both children. The agency alleged that C.S. had been in its temporary custody in excess of 12 of 22 consecutive months and that G.S. could not or should not be returned to his parents' custody. CSB premised the allegation regarding G.S. on Mother's and Father's failures to remedy the concerns impacting their abilities to provide a safe and stable home for the child, as well as the parents' chronic mental health and chemical dependency problems that precluded reunification within a year. In addition to its allegations regarding the best interest of the children, CSB also asserted that "[d]espite family search and engagement efforts, no relatives are identified who are willing/able/appropriate to take Legal Custody."

{¶12} One week later, on October 24, 2019, Grandfather filed four pro se motions: motions to intervene in each child's case and motions for legal custody of each child. After a sunset hearing in November 2019, the juvenile court scheduled pretrial and hearing dates for the agency's permanent custody motion. Although the trial court had not yet ruled on Grandfather's motions to intervene, it copied Grandfather on the scheduling order.

{¶13} In the meantime, Father filed a motion for legal custody of both children to Mother and Father, or alternatively legal custody of the children to Grandfather. Mother filed alternative motions for legal custody, legal custody with protective supervision, legal custody to both Mother and Father with protective supervision, legal custody to Grandfather with protective supervision, or a six-month extension of temporary custody.

{¶14} The juvenile court continued the originally scheduled March 25, 2020 permanent custody hearing due to the Covid-19 pandemic. It rescheduled the final dispositional hearing for mid-August 2020. In the meantime, the trial court scheduled a hearing on Grandfather's motion

to intervene for June 25, 2020. On June 29, 2020, the juvenile court granted Grandfather's motion to intervene without objection by any party.

{¶15} Father requested transport from prison for the permanent custody hearing. Because inmates could not be transported due to pandemic restrictions, the juvenile court continued the permanent custody hearing until December 21 and 22, 2020, as Father was scheduled to be released from prison prior to that time. For an unknown reason, the juvenile court again continued the permanent custody hearing until January 14 and 15, 2021. Mother filed renewed motions, including the five prior alternative dispositional motions, plus a motion for legal custody to her and Father and a motion for legal custody to Grandfather, each without ongoing protective supervision. On January 12, 2021, two days before the permanent custody hearing began, Grandfather filed a "renewed" motion for legal custody of both children. This was the first time he filed a dispositional motion as a party to the action.

{¶16} A visiting judge held a hearing on all pending dispositional motions and gave the parties the opportunity to submit proposed findings of fact and conclusions of law. All parties except the guardian ad litem did so. CSB proposed an award of permanent custody, Father and Grandfather proposed granting legal custody to Grandfather, and Mother proposed an award of any of her alternative dispositions. In their proposed findings of fact and conclusions of law, Mother, Father, and Grandfather each noted that CSB had never added Grandfather to the case plan or developed case plan objectives for him.

{¶17} The juvenile court issued a judgment terminating Mother's and Father's parental rights and granting permanent custody of both children to CSB. The court found that C.S. had been in the agency's temporary custody in excess of 12 months of a consecutive 22-month period, that G.S. could not or should not be returned to his parents' custody based on their

failures to remedy concerns, and that an award of permanent custody was in the best interest of the children. Mother, Father, and Grandfather each timely appealed, raising identical assignments of error for review.

II.

### MOTHER'S ASSIGNMENT OF ERROR

THE TRIAL COURT COMMITTED REVERSIBLE AND PLAIN ERROR WHEN IT TERMINATED THE PARTIES' PARENTAL RIGHTS AS THE EVIDENCE WAS NOT SUPPORTED BY CLEAR AND CONVINCING EVIDENCE AND WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE. (sic.)

### FATHER'S ASSIGNMENT OF ERROR

THE TRIAL COURT COMMITTED REVERSIBLE AND PLAIN ERROR WHEN IT TERMINATED THE PARTIES' PARENTAL RIGHTS AS THE TRIAL COURT'S DECISION WAS NOT SUPPORTED BY CLEAR AND CONVINCING EVIDENCE AND WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

### GRANDFATHER'S ASSIGNMENT OF ERROR

THE TRIAL COURT COMMITTED REVERSIBLE AND PLAIN ERROR WHEN IT TERMINATED THE PARTIES' PARENTAL RIGHTS AS THE EVIDENCE WAS NOT SUPPORTED BY CLEAR AND CONVINCING EVIDENCE AND WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE. (sic.)

{¶18} Mother, Father, and Grandfather purport to assign error relating to the evidentiary basis for the juvenile court's judgment awarding permanent custody of C.S. and G.S. to CSB. Specifically, each party's sole assignment of error asserts that the judgment was against the manifest weight of the evidence. None of the appellants argue, however, that the juvenile court's findings regarding either prong of the permanent custody test were against the manifest weight of

the evidence. Instead, Mother, Father, and Grandfather focus their arguments[1] on an alleged deficiency in the agency's case plan. Specifically, each appellant argues that CSB's failure to add case plan objectives for Grandfather for the purpose of "reunification" of the children with him constituted reversible error. This Court disagrees.

{¶19} As this Court has frequently noted, the juvenile court derives its sole authority in dependency, neglect, and abuse cases from the comprehensive statutory scheme set out in R.C. Chapter 2151. *E.g., In re A.P.*, 9th Dist. Medina No. 12CA0022-M, 2012-Ohio-3873, ¶ 16. R.C. 2151.412, which addresses case plans, further directs the director of job and family services to adopt rules regarding the content, format, development, implementation, and modification of case plans. Those rules are found in various provisions of the Ohio Administrative Code.

{¶20} CSB was required to "prepare and maintain a case plan" for C.S. and G.S. R.C. 2151.412(A)(2). The agency filed its original case plan prior to C.S.' adjudication, amended that case plan once, and then a second time prior to G.S.' adjudication, fulfilling its statutory obligation. *See* R.C. 2151.412(D). The agency's case plan goal remained reunification with the parents throughout the case, even after CSB moved for permanent custody. At all times, the case plan objectives were designed to remedy concerns regarding both parents.

{¶21} Mother, Father, and Grandfather argue that CSB was required to add Grandfather to the case plan once he became a party to the case. Moreover, they argue that the agency was further required to create case plan objectives for Grandfather designed to remedy concerns regarding his ability to be a suitable caregiver for the children in an effort to facilitate "reunification" of the children with him. This Court is not persuaded by the appellants' arguments.

---

[1] Mother and Grandfather have submitted identical briefs except for their identification of

{¶22} Ohio Adm.Code 5101:2-38-05(E) identifies who is a party to the case plan. In addition to the child, child's attorney (if applicable), and guardian ad litem, the list includes the child's "parent, guardian or custodian." *Id.* at (E)(1), (3), (4), (5), and (7).[2] "Custodian" is defined as "a person who has legal custody of a child or a public children services agency or private child placing agency that has permanent, temporary, or legal custody of a child." R.C. 2151.011(B)(11); *see also* Ohio Adm.Code 5101:2-1-01(B)(84). "Legal custody" is "a legal status that vests in the custodian the right to have physical care and control of the child and to determine where and with whom the child shall live, and the right and duty to protect, train, and discipline the child and to provide the child with food, shelter, education, and medical care, all subject to any residual parental rights, privileges, and responsibilities." R.C. 2151.011(B)(21); *see also* Juv.R. 2(V) and Ohio Adm.Code 5101:2-1-01(B)(171). "Guardian" means "a person, association, or corporation that is granted authority by a probate court pursuant to Chapter 2111. of the Revised Code to exercise parental rights over a child to the extent provided in the court's order and subject to the residual parental rights of the child's parents." R.C. 2151.011(B)(17); *see also* Juv.R. 2(N) and Ohio Adm.Code 5101:2-1-01(B)(130). Beyond those enumerated persons, the juvenile court may "specifically identif[y] * * * [a]ny other party" * * * as a party to the case plan." Ohio Adm.Code 5101:2-38-05(E)(8).

{¶23} Grandfather is not the parent of either child. Neither had he ever been awarded legal custody of the children or appointed by the probate court as their guardian. Although he became a party to the juvenile proceedings, he was never "specifically identified by the [juvenile] court as a party to the case plan." *See* Ohio Adm.Code 5101:2-38-05(E)(8). In fact,

the named appellant and the addition of one sentence in Grandfather's brief.

[2] Ohio Adm.Code 5101:2-38-05(E)(2) and (6) include two additional specific categories of individuals not applicable to this case.

there is nothing in the record to demonstrate that Grandfather ever moved the court for an order identifying him as a party to the case plan. Accordingly, CSB had no obligation to treat Grandfather as a party to the case plan, add objectives for him, or seek his agreement regarding amendments, as the agency would have to do regarding designated parties to the case plan. *See* Ohio Adm.Code 5101:2-38-05(T).

{¶24} None of the case law cited by the appellants supports the argument that CSB was required to include Grandfather as a party to the case plan in this case. In *In re J.H.*, 9th Dist. Lorain No. 19CA011522, 2019-Ohio-4510, and *In re S.R.*, 9th Dist. Summit No. 27209, 2014-Ohio-2749, this Court reversed awards of permanent custody based on the agency's failure to add the respective fathers to the case plans. In *In re A.P.*, 2012-Ohio-3873, at ¶ 1, we reversed based on the agency's removal of the child's grandmother from the case plan although the grandmother was the legal custodian of the child when the child was removed. Mother, Father, and Grandfather have cited no authority requiring the addition of extended family members to the case plan where those family members were not the subject child's legal custodian or guardian or had not been designated by the juvenile court as parties to the case plan. This Court declines to expand the agency's duty in the absence of compelling or persuasive authority.

{¶25} Neither is this Court persuaded by the appellants' arguments that Grandfather's addition to the case plan was necessary for purposes of "reunification." Given the substantial right of parents to raise their children, they are entitled to "every procedural and substantive protection the law allows[,]" including "the obligation of the agency to make reasonable efforts to reunify the child[ren] with one or both parents." (Internal quotations and citations omitted.) *In re H.S.*, 9th Dist. Summit Nos. 28944 and 28948, 2018-Ohio-3360, ¶ 14. The law does not recognize rights for grandparents akin to parental rights regarding the care and control of their

grandchildren. In fact, only under very limited circumstances do grandparents even have the legal right to visitation with their grandchildren. *See, e.g.*, R.C. 3109.11 and 3109.12. Reunification efforts, therefore, inure to the benefit of parents and legal custodians or guardians, i.e., nonparents who have been legally endowed with parental rights. *See In re A.P.*, 2012-Ohio-3873, at ¶ 27-28 (recognizing the overriding goal of the case plan to enable the child to return "home," i.e., "the place where the child resided, prior to the commencement of an abuse, dependency, or neglect case, with *one or both of her parents, guardian, or custodian*.") (Emphasis added.) In other words, "case planning and reunification efforts are required to be directed to the person who was the child's legal caretaker at the time the case began: a parent or parents, guardian, or custodian." *Id.* at ¶ 29. As a grandparent who was never awarded legal custody or guardianship of the children, Grandfather had no right to reunification efforts by the agency.[3]

{¶26} R.C. 2151.412(F)(2) and (3) provide the exclusive means for modifying case plans.[4] Subsection (2) allows "[a]ny party [to] propose a change to a substantive part of the case plan, including, but not limited to, the child's placement and the visitation rights of any party." The statute requires the party moving for modification of the case plan to file the proposed changes with the court and give notice to all parties, including the guardian ad litem. The parties then have seven days in which to object and request a hearing to determine whether the proposed changes should become the order of the court. Assuming, without deciding, that "party" in this

---

[3] The appellants' argument regarding "reunification" of C.S. with Grandfather is even more tenuous, as that child was removed from her parents' care shortly after birth without ever having lived in Grandfather's home.

[4] Subsection (3) addresses exigent situations and allows the agency to implement emergency modifications to the case plan without prior notice to the parties or adoption by the court.

context refers to parties to the case and not merely parties to the case plan, there is nothing in the record to indicate that Grandfather, once he became a party to the case, ever moved to modify the case plan to include objectives designed to remedy the agency's concerns regarding his suitability as a caregiver for the children. In the absence of such a request by Grandfather, followed by the adoption by the juvenile court of any proposed modifications to the case plan, CSB had no statutory duty to add case plan objectives for Grandfather.

{¶27} Finally, Mother, Father, and Grandfather argue that CSB was required to work with Grandfather in the interest of maintaining the children in the least restrictive out-of-home placement, prioritizing seeking legal custody to a member of the children's extended family over permanent custody. In developing its case plan, the agency is guided by R.C. 2151.412(H)(2) which prioritizes an award of legal custody to a "suitable member of the child's extended family" over an award of permanent custody. Mother, Father, and Grandfather disregard the word "suitable" in the statute and instead argue to impute a duty on the agency to rehabilitate a relative who has been assessed and determined to be inappropriate, where no such duty exists. R.C. 2151.412(H)(5) directs the agency to pursue permanent custody if a child cannot or should not be returned to his parents and no *suitable* member of the child's extended family or *suitable* nonrelative is able to accept legal custody of the child.

{¶28} CSB assessed Grandfather twice prior to initiating the instant cases, in 2011 and 2015. Because of concerns illuminated during those assessments, the agency determined that he was not a suitable placement for G.S. at those times. Notwithstanding Grandfather's prior unsuitability, the agency initiated a new (third) kinship assessment late in 2018, after Grandfather indicated his interest in placement and possible legal custody of C.S. Unfortunately, due to concerns regarding Grandfather's own personal issues, as well as his failure to

acknowledge the significance of the issues of his own adult children, including Mother, CSB again found Grandfather unsuitable for placement or custody of the children.[5] As there is no statutory obligation for the agency to work to try to rehabilitate an unsuitable relative or nonrelative before seeking permanent custody, CSB's failure to add case plan objectives for Grandfather does not require reversal of the juvenile court's award of permanent custody of C.S. and G.S. For the above reasons, the appellants' substantive arguments in their assignments of error are not well taken.

{¶29} As previously noted, none of the appellants make arguments relating to the manifest weight of the evidence. Nevertheless, given the substantial rights implicated when parental rights are terminated, this Court addresses that assigned error in the interest of justice. *See In re T.B.*, 9th Dist. Summit Nos. 29560 and 29564, 2020-Ohio-4040, ¶ 15 (considering whether the judgment awarding permanent custody was against the manifest weight of the evidence even though the parents-appellants failed to make any substantive arguments in support of that assigned error).

{¶30} In considering whether the juvenile court's judgment is against the manifest weight of the evidence, this Court "weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new [hearing] ordered." (Internal quotations and citations omitted.) *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 20. When weighing the evidence, this Court "must always be mindful of the presumption in favor of the finder of fact." *Id.* at ¶ 21.

---

[5] G.S. had been placed in the agency's emergency temporary custody by this time.

{¶31} Before a juvenile court may terminate parental rights and award permanent custody of a child to a proper moving agency, it must find clear and convincing evidence of both prongs of the permanent custody test: (1) that the child is abandoned; orphaned; has been in the temporary custody of the agency for at least 12 months of a consecutive 22-month period; the child or another child of the same parent has been adjudicated abused, neglected, or dependent three times; or that the child cannot be placed with either parent, based on an analysis under R.C. 2151.414(E); and (2) that the grant of permanent custody to the agency is in the best interest of the child, based on an analysis under R.C. 2151.414(D)(1). R.C. 2151.414(B)(1) and 2151.414(B)(2); *see also In re William S.*, 75 Ohio St.3d 95, 98-99 (1996). The best interest factors include: the interaction and interrelationships of the children, the wishes of the children, the custodial history of the children, the children's need for permanence and whether that can be achieved without a grant of permanent custody, and whether any of the factors outlined in R.C. 2151.414(E)(7)-(11) apply. R.C. 2151.414(D)(1)(a)-(e); *see In re R.G.*, 9th Dist. Summit Nos. 24834, 24850, 2009-Ohio-6284, ¶ 11. Clear and convincing evidence is that which will "produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." (Internal quotations omitted.) *In re Adoption of Holcomb*, 18 Ohio St.3d 361, 368 (1985), quoting *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus.

{¶32} No appellant challenges the juvenile court's first-prong findings, and the record supports those findings. C.S. had been in the agency's temporary custody for approximately 21 months at the time CSB filed its motion for permanent custody. *See* R.C. 2151.414(B)(1) (setting the date that a child enters the temporary custody of the agency as the earlier of the date of the child's adjudication or 60 days after the child's removal from the home). In addition, G.S. could not and should not be returned to his parents' custody, as Mother and Father failed

continuously and repeatedly to substantially remedy the concerns underlying the child's continued removal from her home. Both parents had long-term chemical dependency issues which continued to impact their abilities to provide a safe and stable home for G.S. Despite numerous referrals by the agency and some participation by Mother and Father in various substance abuse services, neither parent was able to achieve sustained sobriety or gain insight into their addiction issues. For these reasons, the juvenile court's first-prong findings in support of permanent custody are not against the manifest weight of the evidence.

{¶33} As to best interest of the children, the juvenile court's findings were also supported by clear and convincing evidence. C.S. was removed by CSB shortly after her birth, based in large part on Mother's use of various drugs throughout her pregnancy and the infant's suffering from withdrawal symptoms upon birth. Father also had significant substance abuse issues, as well as involvement in criminal activity. Upon her release from the NICU, C.S. spent her entire life in foster care. G.S. was a subject child in a prior case but ultimately remained in Mother's legal custody. Mother and G.S. lived together at times in Grandfather's home, while Mother on other occasions left the child to live in Grandfather's home without her. The caseworker testified that G.S. had been residing in Grandfather's home just over a year when the child was removed. Grandfather had a power of attorney regarding G.S., but the extent of his authority over the child is unknown and not explained in the record. The record is clear, however, that Grandfather was not the child's legal custodian or guardian and, accordingly, had no legal rights akin to parental rights regarding G.S.

{¶34} Although the children have remained in separate foster homes, they visit with each other and share a close bond. G.S.' foster family is not available as a permanent placement

for him, but C.S.' foster family is very familiar with G.S. and may be able to provide a permanent home for him. G.S. is comfortable in that environment.

{¶35} Mother and Father visited sporadically with the children for the first six months of the case, but their visits became more consistent over time. Grandfather frequently attended visits with Mother and Father. The caseworker and guardian ad litem reported that the parents were appropriate with the children during visits.

{¶36} C.S. was too young to express her wishes for custody. Besides G.S.' expressed comfort in his foster home, there is nothing in the record to indicate that he had any strong opinion about his custody. The guardian ad litem opined that it was in the best interest of both children to be placed in the permanent custody of CSB for purposes of adoption.

{¶37} Both children require permanency after the significant length of time each spent in the agency's custody. G.S. had been removed two years earlier, while C.S. had been in the agency's care for more than three years at the time of the hearing. Mother and Father are not able to provide a safe and stable home for the children due to various unresolved mental health, substance abuse, and basic needs issues. No suitable alternative caregiver was available for legal custody.

{¶38} Based on a thorough review of the evidence, this is not the exceptional case wherein the trier of fact clearly lost its way and created a manifest miscarriage of justice by granting permanent custody of the children to CSB. The clear and convincing evidence supported the juvenile court's first-prong findings of the permanent custody test and demonstrated that the termination of Mother's and Father's rights was necessary in the best interest of the children. Accordingly, the juvenile court's judgment awarding permanent custody

of C.S. and G.S. to CSB was not against the manifest weight of the evidence. Mother's, Father's, and Grandfather's assignments of error are overruled.

## III.

{¶39} Mother's, Father's, and Grandfather's respective assignments of error are overruled. The judgment of the Summit County Court of Common Pleas, Juvenile Division, is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellants.

LYNNE S. CALLAHAN
FOR THE COURT

CARR, P. J.
SUTTON, J.
<u>CONCUR.</u>


<u>APPEARANCES:</u>

AMBER R. CROWE, Attorney at Law, for Appellant.

NEIL P. AGARWAL, Attorney at Law, for Appellant.

BRENDON KOHRS, Attorney at Law, for Appellant.

SHERRI BEVAN WALSH, Prosecuting Attorney, and HEAVEN R. DIMARTINO, Assistant Prosecuting Attorney, for Appellee.

TONY PAXTON, Attorney at Law, for G.S.

KRISTOPHER IMMEL, Guardian ad Litem.