IN RE GREEN.

(No. 8337 — Decided April 13, 1984.)

*Lee C. Falke,* prosecuting attorney, and *Leon J. Daidone,* for appellee.
*Janet R. Sorrell,* for appellant.

WEBER, J. Appellant, Cheryl Green, an unmarried parent, gave birth to Jeremy Green on August 16, 1980. Within a few days, a dependency complaint was appropriately filed, alleging that Ms. Green would be unable to care for her child. Montgomery County Children's Services then removed the baby from the home of Green's brother, where she was temporarily living.

In early November of that year, the baby was returned to his mother, under the periodic supervision of the Children's Services. At some point, Green dropped her baby on his head. Shortly thereafter, the child was placed back in foster care, where he has remained. The juvenile court granted the motion of Children's Services for temporary custody on May 4, 1981.

On August 3, 1983 Children's Services filed a motion for permanent custody alleging that appellant had failed to comply with the comprehensive reunification plan; had not established a stable residence; had not improved in personal skills and was unable to care for herself. After an evidentiary hearing, the juvenile court awarded permanent custody of the child to Children's Services on April 15, 1983.

From that judgment, the mother has timely appealed, asserting as her first assignment of error that in determining custody, the juvenile court's consideration of a psychological evaluation of her violated her rights as an indigent person under the Due Process and Equal Protection Clauses.

On February 8, 1983, the juvenile court granted appellant's motion requesting the court to order a psychological evaluation of her by a psychologist named by the appellant, at county expense, due to appellant's indigency. The motion stated the purpose of this evaluation was to respond to and counter the findings of an earlier evaluation performed by Dr. Bergman, the psychologist from Children's Services, the results of which were generally unfavorable to appellant.

On April 12, 1983, appellant moved for exclusion of the requested evaluation from the juvenile court's records. At the custody hearing the next day, this motion was overruled and the juvenile court admitted the evaluation as "Court's Exhibit 1."

On appeal, appellant asserts, even though the evaluation was ordered by the juvenile court at public expense, that it was intended solely for her own representation at the custody hearing rather than for the court's review. Appellant contends that an attorney for an indigent parent in a custody hearing must be allowed to limit disclosure of unfa-

vorable evidence in order to effectively represent the client.

Appellant suggests that a non-indigent parent who is financially able to employ a private psychologist to perform an evaluation can limit disclosure of any unfavorable results, since usually the results would be known only to the psychologist, the client, and the attorney. Appellant argues that an indigent parent who has the right to a free court-ordered psychological evaluation should likewise have the right to limit disclosure of adverse results of such testing. Appellant contends that otherwise, an attorney might decide to forego requesting a psychological evaluation of the client for fear that favorable results, if any, may be outweighed by adverse results, which the juvenile court would consider negatively in determining permanent custody of the child.

The referral of appellant to Dr. Kuehnl was understood to be for the purpose of assisting "the Montgomery County Juvenile Court in determining her capability of resuming responsibility for her two minor children" and, thus, the juvenile court ordered this relevant psychological evaluation pursuant to Juv. R. 32(A), which provides that:

*"The court may order and utilize* a social history or physical or mental examination *at any time* after the filing of a complaint:

"(1) Upon the *request of the party* concerning whom the history or examination is to be made;

"* * *

"(3) *Where a material allegation of a* neglect, *dependency,* or abused child *complaint relates to matters that such a history or examination may clarify;"* (Emphasis added.)

Where the court orders such an evaluation, it may utilize it.

Further, whether the instant evaluation is characterized as a "mental examination" under Juv. R. 2(15) or a "social history" under Juv. R. 2(21), in any event, the results of such an evaluation may not be withheld for the sole reason that they reflect unfavorably upon the parent. In fact, such matters are routinely discoverable under Juv. R. 24(A), which provides in part:

"Upon written request, each party of whom discovery is requested shall forthwith produce for inspection, copying, or photographing the following information, documents, and material in his custody, control, or possession:

"* * *

"(2) Copies of any written statements made by any party or witness;

"* * *

"(4) Any scientific or other reports which a party intends to introduce at the hearing * * *;"

Additionally, the unique purposes of the juvenile court, as outlined in Juv. R. 1(B), are expressly designed to facilitate truth-seeking even to a greater degree than the usual criminal or civil adversary proceeding. Not only does the informal manner in which hearings are conducted encourage this process, but also the broad discretion granted the juvenile court with respect to taking evidence at hearings. See Juv. R. 27 and 34(B).

The proceeding on April 13, 1983 was an "adjudicatory hearing," since its purpose was to make permanent a temporary custody order, but it was also "dispositional" in nature. Juv. R. 2(1) and (8). With respect to dispositional hearings, Juv. R. 34(B) provides in part:

"(2) The court may admit *any evidence that is material and relevant,* including hearsay, opinion and documentary evidence; and

"(3) Medical examiners and each investigator who prepared a social history shall not be cross-examined, except upon consent of all parties, for good cause shown, or as the court in its discretion may direct. *Any party may offer evidence supplementing, explaining, or disputing any information contained in the social history or other reports*

*which may be used by the court in determining disposition.*" (Emphasis added.)

In our opinion, it was not error for the juvenile court to consider the results of the mother's psychological evaluation by Dr. Kuehnl in reaching its custody determination.

If only the portions of the report favorable to the examined parent were admitted while the unfavorable aspects of the evaluation were withheld, the juvenile court would not be presented with the totality of evidence which it necessarily needs to make a determination as highly significant as the permanent custody of a young child.

Had the court ordered the report for the purpose of preparing "solely for her [appellant's] defense," the constitutional argument of appellant might take on more substance; however, here the report was not ordered solely for her defense. To raise the constitutional issue portrayed in the first assignment of error, appellant, after it became clear that the report she requested was considered ordered pursuant to Juv. R. 32(A), must request an additional report specifically for the purpose of rebutting the reports of the experts presented to the court and must unequivocally indicate to the examining expert the exact purpose of the report and that its results are to be confidential between the patient and the expert. It should further unequivocally state that the report should not be sent to the court, but only to the appellant or her attorney. Such a request, of course, would be addressed to the discretionary authority of the trial court.

Accordingly, the first assignment of error is not well-taken.

As her second assignment of error appellant contends the juvenile court erred in granting permanent custody to Children's Services because the element of "dependency" was not proven by the requisite standard of clear and convincing evidence.

R.C. 2151.35 provides that the fact of dependency must by proven by clear and convincing evidence. See *In re Bibb* (1980), 70 Ohio App. 2d 117 [24 O.O.3d 159]. "Dependent child" is defined under R.C. 2151.04(B) as "any child * * * [w]ho lacks proper care or support by reason of the mental or physical condition of his parents, guardian, or custodian." The amended complaint seeking an order of permanent custody alleged that the child Jeremy was "without adequate care because of [his] mother's physical condition in that [his] mother is subject to uncontrolled petit mal seizures during which she could physically harm the baby."

At the hearing, it was discovered that Ms. Green was known to have dropped her baby several times before he was placed in the care of Children's Services. She then began counseling with Paul Merrick, a counselor with Family Services Association, in order to become more responsible for her own well-being (as well as her child's) and to establish homemaker skills. Green eventually abandoned this counseling for lack of interest.

Merrick assessed Green's major counseling problem as her lack of assertiveness in dealing with others (especially men with whom she temporarily lived, who victimized her both physically and financially). In Merrick's opinion, Green was unable to engage in safe and stable relationships and to live in a psychologically independent manner.

Dr. Bergman, a psychologist with Children's Services, testified that her assessment of Green consisted of a personal interview, psychological testing, review of her files, and information from Green's caseworker. Bergman testified that Green exercised extremely poor social judgment and continuously formed destructive relationships. Bergman's testimony established: Green's background was very chaotic, unstable, and unloving; she was sexually abused by her alcoholic father through

childhood; she married to get out of the home; she was divorced shortly thereafter; she lived with a sixteen-year-old boy while she was twenty-seven years old; the young man physically abused her, took her money, abused drugs, and did not work; she had been raped twice by a boyfriend's father; she had been raped approximately thirty times in her life; and she had a personality disorder of chronic depression and passivism.

Bergman testified that Green's prognosis for significant change is poor. Bergman testified Green's inability to establish a stable environment and to protect herself indicates that she would also be unable to protect her child. Bergman recommended that the child not be placed back with the mother.

Jacquelyn Cameron testified that she had been Green's caseworker at Children's Services since June 1981. She testified that the goals of the reunification plan were to help Green get medical treatment for her seizures, improve her inconsistent living arrangements, assist in budgeting her disability income, and help her gain assertiveness in personal relationships.

Although Cameron was aware, at the time of the hearing, that the occurrences of Green's seizures had diminished and that she had lived consistently with the same boyfriend for approximately eight months, Cameron nonetheless suggested that the child not be returned to the mother. Cameron testified she saw no improvement in Green's emotional status, her maturity, or her ability to parent.

At the hearing, appellant's evidence consisted mostly of testimony concerning her changed circumstances, *i.e.,* improved consistency in housing and her stabilized medical condition. While the juvenile court commended Green for these steps, it found that such facts were outweighed by her remaining psychological problems, the poor prognosis for change, and the recommendations of the child's guardian ad litem, two psychologists and the caseworker, that the child remain in the foster home.

As an appellate court, we may not substitute our judgment for that of the trial court. This rule is founded on the more accurate perceptions of a judge who hears and sees the parties testify, and who can make personal, intimate observations about the child, his parents and the relationship between them. See *In re Glasper* (Aug. 18, 1982), Montgomery App. No. 7494, unreported.

The record establishes serious questions concerning Green's ability to provide her child with its basic dependency needs, such as food, clothing, shelter, medical attention, education, supervision, growth development and nurturing.

There existed clear and convincing evidence upon which the juvenile court could find a present and potential lack of parental care so that the child was "dependent" under R.C. 2151.04(B).

Having determined that Jeremy was a dependent child, the juvenile court was authorized under R.C. 2151.353(A)(4) to commit the child permanently to Children's Services. Accordingly, we find appellant's second and final assignment of error to be without merit and affirm the juvenile court's decision.

*Judgment affirmed.*

KERNS and WILSON, JJ., concur.