[Cite as *In re G.T.*, 2022-Ohio-1406.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

| | | |
|---|---|---|
| IN RE G.T. | : | |
| | : | No. 110936 |
| A Minor Child | : | |
| | : | |
| [Appeal by R.M., Mother] | : | |

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** April 28, 2022

Civil Appeal from the Cuyahoga County Court of Common Pleas
Juvenile Division
Case No. AD-21-905304

### *Appearances:*

Cullen Sweeney, Cuyahoga County Public Defender, and
Francis Cavallo, Assistant Public Defender, *for appellant*.

Michael C. O'Malley, Cuyahoga County Prosecuting
Attorney, and Joseph C. Young, Assistant Prosecuting
Attorney, *for appellee*.

MARY J. BOYLE, J.:

{¶ 1} Appellant, R.M. ("Mother"), appeals from the juvenile court order awarding temporary custody of her son, G.T., to appellee, the Cuyahoga County Department of Children and Family Services ("CCDCFS" or "the agency"). For the reasons set forth below, we affirm the juvenile court's judgment.

## I. Facts and Procedural History

{¶ 2} On June 20, 2021, Mother was arrested following an altercation with her mother ("Grandmother") while Mother and G.T. (d.o.b. 06/01/18) were living at Grandmother's home. Two days later, CCDCFS requested emergency temporary custody of G.T. The juvenile court held an ex parte telephonic hearing at which CCDCFS caseworker Ashiki Lakes ("Lakes") provided testimony. The court determined that probable cause supported removal of G.T. The court found that Mother had threatened to kill herself and G.T. once in the previous few weeks and again within the prior 24 hours. The court also found that Mother had been arrested following a domestic altercation with Grandmother, wished to take G.T. with her from Grandmother's house, and threatened to harm herself if she were prevented from doing so. Further, the court found that Mother had been referred to several mental health service providers but her behavior had not changed, and Mother was unwilling to agree to a safety plan. The court issued an order committing G.T. to the emergency care and custody of CCDCFS. CCDCFS subsequently placed G.T. with Grandmother.

{¶ 3} On June 23, 2021, CCDCFS filed a complaint in the juvenile court, alleging that G.T. was neglected and dependent and requesting predispositional temporary custody of G.T. The agency alleged that "Mother has unresolved mental health issues which interfere with her ability to provide adequate parental care for [G.T.] and which jeopardize [his] safety." The agency also alleged that a month prior to its filing of the complaint, Mother had "on multiple occasions threatened to kill

herself and [G.T.], including as recently as June 22, 2021." The agency alleged that on June 20, 2021, Mother was arrested for "brandish[ing] a knife during an argument" with Grandmother while Mother and G.T. were living at Grandmother's home; that G.T. was present during the argument and, because of the incident, Grandmother asked Mother to leave her home; and that Mother is without stable housing because her "current residence is not a permanent home." The agency further alleged that the identity of alleged father ("Father") is unknown and Father has failed to establish paternity or "support, visit, or communicate with [G.T.] since birth."

{¶ 4} On June 24, 2021, the juvenile court held a hearing on the agency's request for predispositional temporary custody. Through counsel and a Swahili interpreter, Mother denied the allegations in the complaint but stipulated to a finding of probable cause supporting predispositional temporary custody to CCDCFS provided that G.T. remain in Grandmother's care pending resolution of the temporary custody proceedings. The court granted the agency's request for predispositional custody, finding that G.T. would remain in Grandmother's care. The court also found that Mother "has limited English proficiency and requires a qualified Swahili interpreter to assist [Mother] at future hearings."

{¶ 5} On July 21, 2021, the court held a pretrial to review predispositional custody of G.T. and set an adjudication hearing date, but due to confusion in bus schedules or routes, Mother could not attend the hearing. The hearing was therefore rescheduled for August 25, 2021.

{¶ 6} On July 22, 2021, CCDCFS filed a case plan that included mental health assessment and services for Mother, then 19 years old, with the goal that Mother would be able to manage her mental health, demonstrate coping skills, and be able to meet her own basic needs while meeting those of her child. The case plan also made provisions for stable housing, adequate income, and a monthly budget for adequate food and appropriate clothing, rent, and utilities. The plan noted that G.T.'s temporary placement with Grandmother was safe and meeting his basic needs and was in close proximity to Mother. The goal of the plan was G.T.'s reunification with Mother.

{¶ 7} On August 3, 2021, the guardian ad litem ("GAL") for G.T. filed his report, recommending that G.T. be committed to the temporary custody of CCDCFS. The GAL noted that Mother did not appear to have permanent housing and could not provide for G.T.'s basic needs. The GAL further noted that Mother "may have some ongoing mental health issues [that] impact her ability to care for [G.T.]" The GAL observed that Grandmother appeared to be taking good care of G.T.

{¶ 8} On August 25, 2021, the juvenile court held the pretrial hearing to review predispositional custody of G.T. The court found that G.T. would remain in Grandmother's care pending the adjudication hearing. The court ordered CCDCFS to facilitate in-person visits between Mother and G.T. "at least one time per week for a minimum of two hours."

{¶ 9} On September 8, 2021, the juvenile court held the adjudication hearing before a magistrate. Lakes testified on behalf of CCDCFS. Lakes reiterated

that Mother had initially been referred to CCDCFS in June 2021, after Mother had threatened to kill herself and G.T. Lakes stated that Mother had admitted that she made this threat because she felt that Catholic Charities, which had been providing mental health counseling to Mother and helping her return to school, was trying to separate Mother from her family.

{¶ 10} Lakes testified that CCDCFS received a second referral the day after Mother's release from jail, following Mother's altercation with Grandmother. Mother informed Lakes that she could no longer stay with Grandmother and planned to "sleep out on the street with [G.T.]" Lakes added that when she told Mother that she and G.T. could not live on the street, Mother again threatened to kill herself. Lakes stated that Mother was unemployed, could not meet her and G.T.'s basic needs, had been living with Grandmother, and relied on Grandmother's financial assistance to meet G.T.'s needs. Lakes said that CCDCFS had referred Mother to Community Collaborative and Positive Education Program Connections for mental health counseling and sought removal of G.T. only after Mother did not agree to the agency's proposed safety plan.

{¶ 11} On cross-examination, Lakes, a caseworker, admitted that she had referred to herself as a social worker during her testimony. When asked what had precipitated the altercation between Mother and Grandmother, Lakes stated that Mother wanted to leave the house with G.T. and Grandmother would not allow it. Lakes admitted that Mother was staying with a friend after leaving Grandmother's house; the friend's house was appropriate and had food for G.T.; and the friend was

willing to allow Mother and G.T. to live there. Lakes added that the friend's house could be a possible place for Mother and G.T. to live after Mother addressed the agency's concerns about her mental health.

{¶ 12} Mother testified on her own behalf. Mother testified that she and G.T. had moved from Burundi to the United States in 2019 when G.T. was a year old and, until recently, had been living with Grandmother. Mother stated that Grandmother is Congolese, and in Congolese culture, it is shameful for an unmarried daughter to get pregnant. Mother said that parents can "even * * * chase you from home if you get pregnant before you get married." Mother said she does not know the identity of G.T.'s father and attributed the tensions between her and Grandmother to Grandmother's shaming her for being a single mother. Mother added that when she and G.T. first arrived in the United States, Mother was unemployed, Grandmother did not help with G.T., and Mother "did a lot of things which are not good to take care of [her] child."

{¶ 13} Mother also testified about her employment history since arriving in the United States. Mother said that when COVID-19 first started, she and Grandmother were working opposite shifts. A few months later, Mother quit her job and began attending high school. While Mother was in school, G.T. was in daycare. Mother said that Grandmother provided neither Mother nor G.T. any financial assistance but on cross-examination stated that Grandmother provided approximately 20 percent of G.T.'s basic needs. Mother stated that she had taken care of G.T. from his infancy and no one, including Grandmother, could provide

better care for G.T. Mother said she would "even stop going to school and start working so that [she] can take care of [G.T.]"

**{¶ 14}** Mother testified about her threats of self-harm. Mother stated that Grandmother advised her to tell CCDCFS that if G.T. were removed, she would kill herself. Mother said that she would not have said this had she known it would cause her trouble. Mother admitted that prior to the agency's involvement, she had made a similar threat "because there were problems which are [sic] affecting me at that time. And I wouldn't like to talk about that because that was something between me and my doctors." Mother denied having mental health problems, adding that the allegation that she has mental illness "affects her a lot" and that she is not currently in counseling.

**{¶ 15}** Mother testified about the altercation with Grandmother. Mother stated that when the police arrived, they said nothing to her, just arrested her, and took her to jail. Mother denied brandishing a knife during the altercation. Mother stated that after she was released from jail, she received a text message from Catholic Charities advising her not to return to Grandmother's home because if she did, the police again would arrest her. Mother then went to stay with a friend.

**{¶ 16}** After hearing this testimony, the magistrate determined that CCDCFS failed to prove by clear and convincing evidence that Mother had brandished a knife during the altercation with Grandmother. Finding that the agency had offered no testimony supporting this allegation and that Mother had denied the allegation, the magistrate ordered the complaint to be amended to delete reference to the knife.

The magistrate determined, however, that CCDCFS proved the complaint's remaining allegations by clear and convincing evidence and adjudicated G.T. neglected and dependent. Based on concerns raised by Mother, the magistrate ordered the agency to meet with Grandmother to make sure that G.T.'s placement with Grandmother was appropriate. The magistrate also ordered the agency to give Mother a copy of the case plan translated into Swahili. The court issued a journal entry the same day, September 8, 2021, finding that "the allegations of the Complaint as amended have been proven by clear and convincing evidence," and attached a copy of the amended complaint to this journal entry.

{¶ 17} On September 21, 2021, Mother timely filed objections to the magistrate's decision, arguing that Lakes violated the law by misrepresenting herself as a social worker; the magistrate did not permit Mother to fully question Lakes about her training, education, and experience; the magistrate's entry lacked findings of fact and conclusions of law required for an adjudicatory decision; the magistrate's decision that G.T. was neglected and dependent was not supported by clear and convincing evidence; and the magistrate failed to consider the importance of Swahili culture to the events of the case. On October 5, 2021, the juvenile court overruled Mother's objections and affirmed, approved, and adopted the magistrate's decision.

{¶ 18} On October 6, 2021, the matter proceeded to a dispositional hearing before the magistrate. Mother agreed to the case plan, which CCDCFS had translated into Swahili. Mother stated that she would be finishing school and not obtaining employment but would be applying for financial assistance and housing.

Mother believed that qualifying for financial assistance would meet the "adequate income" portion of the case plan. Mother agreed to temporary custody of G.T. to CCDCFS and that G.T. should remain with Grandmother until Mother satisfied the case plan. The magistrate informed Mother that to resume custody of G.T., she would have to complete or substantially comply with the objectives of the case plan. When asked about Father, Mother stated that he lived in Burundi but did not identify him by name.

{¶ 19} Child protection specialist Adonte Haddox ("Haddox") testified on behalf of CCDCFS. Haddox testified that Father remained unidentified and no one had claimed to be G.T.'s father. Haddox stated that the case plan requires Mother to obtain housing, provide basic needs to G.T., and undergo a mental health assessment through Ohio Guidestone, which had arranged for a Swahili interpreter. Haddox confirmed that G.T. would remain in Grandmother's temporary custody. The GAL recommended that the court adopt the parties' stipulated agreement to temporary custody to CCDCFS.

{¶ 20} The magistrate approved the case plan and granted temporary custody of G.T. to the agency. The magistrate scheduled a review hearing for May 2022, or earlier upon motion of either party, depending on whether Mother is substantially complying with the case plan.[1] The magistrate confirmed that Mother is living with a friend and asked whether Mother sees G.T. every day. Haddox could

---

[1] Upon learning of the May 2022 review hearing, Mother became visibly upset, and the magistrate added, "If anytime earlier, if [M]other is substantially complying with her case plan, anybody can file a motion earlier and we can come back in here sooner."

only confirm that Mother sees G.T. during agency-approved visitation but added that Mother remains close with Grandmother and likely sees G.T. more often.

{¶ 21} On October 7, 2021, the magistrate entered his decision, finding that Mother stipulated to the agency's dispositional request for temporary custody of G.T.; that G.T.'s return to Mother was not in his best interest; that CCDCFS made reasonable efforts to prevent removal; and that G.T. is placed with Grandmother pending a May 27, 2022 hearing to review whether Mother has obtained stable housing, can provide for G.T.'s basic needs, and has completed a mental health assessment at Ohio Guidestone, at which a Swahili interpreter would be provided.

{¶ 22} On October 18, 2021, Mother filed a notice of appeal, contesting the magistrate's September 8, 2021 finding that CCDCFS had proven by clear and convincing evidence that G.T. was neglected and dependent, which the juvenile court affirmed, approved, and adopted in its October 5, 2021 journal entry.

{¶ 23} On February 17, 2022, this court, sua sponte, remanded the matter to the juvenile court to enter a final order, finding that the record contained only the juvenile court's overruling of Mother's objections to the magistrate's September 8, 2021 decision. On March 22, 2022, the juvenile court supplemented the record with its October 25, 2022 judgment entry affirming, approving, and adopting the magistrate's October 7, 2021 decision.

{¶ 24} It is from this judgment that Mother appeals, raising two assignments of error for review:

1. The juvenile court erred in adjudicating the minor child G.T. neglected against the manifest weight of the evidence presented at trial.

2. The juvenile court erred in adjudicating the minor child G.T. dependent against the manifest weight of the evidence presented at trial.

## II. Law and Analysis

{¶ 25} A juvenile court's determination that a child is neglected or dependent must be based on clear and convincing evidence. R.C. 2151.35(A)(1); Juv.R. 29(E)(4). *In re E.E.*, 8th Dist. Cuyahoga No. 110021, 2021-Ohio-2770, ¶ 30, citing *In re Vinci*, 8th Dist. Cuyahoga No. 73043, 1998 Ohio App. LEXIS 4100, 7 (Sept. 3, 1998), and *In re Hauserman*, 8th Dist. Cuyahoga Nos. 77235 and 77252, 2002 Ohio App. LEXIS 1113, 9 (Mar. 11, 2002). Clear and convincing evidence is defined as that "measure or degree of proof which is more than a mere 'preponderance of evidence' but not to the extent of such certainty as is required 'beyond a reasonable doubt' in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *In re Awkal*, 95 Ohio App.3d 309, 315, 642 N.E.2d 424 (8th Dist.1994), fn. 2, citing *Lansdowne v. Beacon Journal Publishing Co.*, 32 Ohio St.3d 176, 180-181, 512 N.E.2d 979 (1987), and *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus.

> When evaluating a claim that a judgment was contrary to the manifest weight of the evidence, [an appellate court] must review the record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered.

*In re Z.H.*, 1st Dist. Hamilton Nos. C-150301 and C-150305, 2015-Ohio-3209, ¶ 10, citing *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997), citing *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). The appellate court should defer to the juvenile court's credibility determinations, particularly in matters involving children, because "'there may be much evident in the parties' demeanor and attitude that does not translate to the record well.'" *In re C.O.*, 8th Dist. Cuyahoga Nos. 99334 and 99335, 2013-Ohio-5239, ¶ 30, quoting *Davis v. Flickinger*, 77 Ohio St.3d 415, 418, 674 N.E.2d 1159 (1997).

## A. Neglect of G.T.

{¶ 26} Within her first assignment of error, Mother contends that CCDCFS based its claim that G.T. was neglected on Mother's temporary unemployment, lack of a residence in her own name, and an unsupported allegation that Mother had a mental health issue. Mother claims that she is equipped to care for G.T. Mother argues that the agency should have explored her eligibility for financial assistance because she is in school. Mother also argues that even though she could no longer stay with Grandmother, she was staying at the home of a friend who said that Mother and G.T. could live there.

{¶ 27} CCDCFS contends that Mother's circumstances at the time of the complaint determine whether G.T. was properly adjudicated neglected. The agency argues that at the time of the complaint, Mother was unemployed; had been involved in a violent domestic altercation with Grandmother for which Mother was jailed; had no clear means of providing for G.T.'s basic needs after her release from jail;

lacked stable housing; had discontinued counseling; and disagreed with the agency's safety plan after threatening to take her child's life and twice threatening to take her own life.

{¶ 28} R.C. 2151.03(A)(2) defines a "neglected child" as any child "[w]ho lacks adequate parental care because of the faults or habits of the child's parents, guardian, or custodian[.]" "'Adequate parental care' means the provision by a child's parent or parents, guardian, or custodian of adequate food, clothing, and shelter to ensure the child's health and physical safety[.]" R.C. 2151.011(B)(1). R.C. 2151.03(A)(2) "requires some showing that parents, a guardian, or a custodian is at fault before a finding of a lack of proper (or adequate) care can be made." *In re Riddle*, 79 Ohio St.3d 259, 262, 680 N.E.2d 1227 (1997). Refusal to cooperate with case plan services is sufficient fault to support a finding of neglect under R.C. 2151.03(A)(2). *In re C.T.*, 6th Dist. Sandusky No. S-18-005, 2018-Ohio-3823, ¶ 57. "To determine whether a child is neglected or dependent, the date on which neglect or dependency 'existed must be alleged in the complaint and the trial court must determine that the circumstance(s) which support a finding of dependency [or neglect] existed as of the date or dates alleged in the complaint.'" *In re E.E.*, 2021-Ohio-2770, at ¶ 41, quoting *In re C.O.*, 2013-Ohio-5239, at ¶ 31.

{¶ 29} Here, the relevant date is June 23, 2021, when CCDCFS filed its complaint alleging that G.T. was neglected. In his September 8, 2021 entry, the magistrate found that "the allegations of the Complaint as amended ha[d] been proven by clear and convincing evidence." A copy of the amended complaint was

attached to the journal entry. The amended complaint removed reference to Mother's brandishing a knife during the altercation with Grandmother but retained the remaining allegations. On October 5, 2021, the juvenile court affirmed, approved, and adopted the magistrate's decision. We therefore examine the record to determine whether CCDCFS proved the allegations in the amended complaint and whether, after resolving conflicts in the evidence, the juvenile court based its determination that G.T. was neglected on clear and convincing evidence.

{¶ 30} In the amended complaint, CCDCFS first alleges that "Mother has unresolved mental health issues which interfere with her ability to provide adequate parental care for [G.T.] and which jeopardize [G.T.'s] safety" and that Mother "on multiple occasions threatened to kill herself and [G.T.], including as recently as June 22, 2021." Mother argues that CCDCFS did not support its concerns about Mother's mental health by a clinical diagnosis or evidence of treatment. Mother maintains that her threat to kill herself following the altercation with Grandmother was a "single statement" "uttered under enormous stress" in a second language or "filtered through an interpreter." The agency argues that Mother had been in counseling with Catholic Charities and "twice threaten[ed] to kill herself and/or her child."

{¶ 31} The record reveals that CCDCFS did not establish its concerns about Mother's mental health by a clinical diagnosis. However, the agency did proffer evidence that Mother was in treatment and had threatened to kill herself and G.T. Lakes testified that Mother was initially referred to CCDCFS in early June 2021,

about a month before the agency filed its complaint. This referral followed Mother's threat kill herself and G.T. because she believed that Catholic Charities, which was providing counseling services to Mother at that time, was trying to separate Mother from her family. A second referral followed Mother's arrest on June 20, 2021. Mother testified that after she was released from jail, she received a text message from Catholic Charities advising her not to return to Grandmother's home because if she did, the police would again arrest her. Lakes contacted Mother to ask where she and G.T. planned to stay if Mother could not return to Grandmother's. Mother replied that she intended to sleep out on the street with G.T., and when Lakes responded that it would not be appropriate for her to do so, Mother again said that she would kill herself. Lakes testified that Mother did not follow up with the agency's referrals for mental health counseling and did not agree with the agency's safety plan.

{¶ 32} Mother testified that Grandmother instructed Mother to say that she would kill herself if the agency threatened to remove her child and admitted she would not have made this threat had she known the consequences of making it. Mother apologized for making the threat, denied having a mental health issue, and stated that the allegation that she suffers from mental illness "affects her a lot." Mother also testified to the stigma associated with mental illness in Swahili culture and stated that she was no longer seeing a counselor.

{¶ 33} Mother may regret making this threat, but the record does not support Mother's contention that the threat was a "single statement" "uttered under

enormous stress." As noted above, Lakes testified that Mother was initially referred to the agency after threatening to kill herself and G.T. Whatever Lakes may have learned from the Catholic Charities counselor about the nature of this threat was excluded by a hearsay objection. On cross-examination, Mother admitted that she had threatened to kill herself while she was in counseling with Catholic Charities, before CCDCFS became involved:

> CCDCFS: The first time that it was reported you made that statement, the Agency was not involved at that time, so why would your mother tell you to say that if nobody was involved?

> Mother: The first time — the first time it was not the Agency. The first time, it was me because there were problems which are [sic] affecting me at that time. And I wouldn't like to talk about that because that was something between me and my doctors.

{¶ 34} Although there is no evidence that Mother has harmed or attempted to harm herself or G.T., the juvenile court found that Mother's suicidal and homicidal ideations "interfere with her ability to provide adequate parental care for [G.T.]" and "jeopardize [G.T.'s] safety." The record reveals that at the time the agency filed its complaint, Mother had threatened to kill herself and G.T., was jailed after an altercation with Grandmother, planned to live out on the street when told she could not return to Grandmother's, threatened to kill herself a second time after being told that living on the street would not be appropriate, and refused the agency's safety plan and referrals to mental health counseling. The record therefore supports the juvenile court's finding that Mother's suicidal and homicidal ideations and poor decision-making placed G.T.'s safety at risk.

**{¶ 35}** CCDCFS next alleges in the amended complaint that the police arrested Mother during the altercation with Grandmother, and G.T. was "present in the home when this incident occurred." Lakes testified that G.T. remained at Grandmother's following Mother's arrest. Mother testified that having nowhere else to go following her arrest, she went to stay at her friend's house. The record supports the juvenile court's finding that G.T. was present in the home during the altercation between Mother and Grandmother.

**{¶ 36}** The agency also alleges in the amended complaint that following this altercation, Mother was asked to leave Grandmother's home, did "not have stable housing in which to care for [G.T.]," and "Mother's current residence is not a permanent home for her and [G.T.]." Mother argues that the friend has agreed that Mother and G.T. can stay there. Lakes testified that the friend's home was appropriate, had enough food for G.T., and could present a possible longer-term place to live after Mother addresses the agency's concerns about her mental health. As for Mother's finances, Lakes stated that Mother was unemployed, could not meet her and G.T.'s basic needs, and relied on Grandmother's financial assistance to meet G.T.'s needs. Mother testified that she quit her job to enroll in high school and Grandmother provided about 20 percent of G.T.'s basic needs. Mother later testified at the October 6, 2021 disposition hearing that she intends to finish school, which prevents her from finding a job, but added that she planned to seek financial assistance and housing.

{¶ 37} At the time of the complaint, Mother was no longer living with Grandmother, who not only provided housing to Mother and G.T., but also some appreciable percentage of G.T.'s basic needs while Mother was unemployed and finishing school. Also, Grandmother continued to care for G.T. after Mother went to stay with a friend, and it is not entirely clear from the record when Mother's friend agreed that Mother and G.T. could both live at the friend's house. This arrangement between Mother and Mother's friend appears to have followed the agency's filing of the complaint, and the record does not indicate whether, in addition to housing, the friend also agreed to provide for G.T.'s other basic needs or whether Mother had applied for government assistance while she was without income to support herself and G.T. Mother's subsequent testimony that she intended to finish school and apply for government assistance and housing suggests that she had yet to do so. The record thus supports the juvenile court's finding that Mother was without permanent housing and the financial means to care for G.T. at the time the agency filed its complaint.

{¶ 38} CCDCFS lastly alleges in the amended complaint that Father "has failed to establish paternity and has failed to support, visit, or communicate with [G.T.] since [G.T.'s] birth." Lakes and Mother both testified that Mother did not know Father's identity. Mother testified that she only knew that Father lived somewhere in Burundi. The record therefore supports the juvenile court's finding that Father cannot support or help support G.T.

{¶ 39} Taken together, these findings establish by clear and convincing evidence that without mental health support and financial assistance, Mother could not provide adequate parental care to G.T. In light of these findings, Mother's rejection of CCDCFS's safety plan is sufficient fault to support a finding of neglect under R.C. 2151.03(A)(2).

{¶ 40} Mother also contends that Lakes, the agency's sole witness, suffered credibility issues when she referred to herself as a social worker at the start of her testimony and these credibility issues undermine CCDCFS's case. Mother points to Lakes's admission on cross-examination that she has a degree in psychology but works for CCDCFS as a caseworker, not a social worker, which, Mother maintains, could expose Lakes to criminal liability under R.C. 4757.02 and implicates R.C. 2921.11(A) because Lakes made this statement under oath. Mother claims that the juvenile court improperly precluded further inquiry into Lakes's credentials.

{¶ 41} CCDCFS contends, however, that the record does not support Mother's claim that the juvenile court foreclosed any further inquiry into Lakes's credentials; rather, the court limited further questioning concerning Lakes's criminal liability. The agency maintains that R.C. 4757.02, prohibiting the practice of social work without a license, has no relevance to Lakes's single reference to herself as a social worker at the beginning of her testimony and the record's many references to caseworkers as social workers disproves Mother's claim that Lakes's reference amounted to a misrepresentation or perjury. To establish perjury, the agency argues, it must be shown that the witness has knowingly made a material

false statement under oath. The agency maintains that Lakes's "one-time misstatement" was neither knowing nor material.

{¶ 42} We note at the outset that an appellate court should defer to the juvenile court's credibility determinations. As explained by the Supreme Court of Ohio,

> "The underlying rationale of giving deference to the findings of the trial court rests with the knowledge that the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony.
>
> * * *
>
> A reviewing court should not reverse a decision simply because it holds a different opinion concerning the credibility of the witnesses and evidence submitted before the trial court. A finding of an error in law is a legitimate ground for reversal, but a difference of opinion on credibility of witnesses and evidence is not. The determination of credibility of testimony and evidence must not be encroached upon by a reviewing tribunal, especially to the extent where the appellate court relies on unchallenged, excluded evidence in order to justify its reversal."

*Davis*, 77 Ohio St.3d at 418-419, 674 N.E.2d 1159, quoting *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 80-81, 461 N.E.2d 1273 (1984). "This [rationale] is even more crucial in a child custody case, where there may be much evident in the parties' demeanor and attitude that does *not* translate to the record well." (Emphasis sic.) *Id.* at 419.

{¶ 43} R.C. 4757.02(B)(2) prohibits use of the title "social worker" unless the person using that title "is currently authorized by licensure * * * to act in the capacity indicated by the title." A violation of R.C. 4757.02 is a misdemeanor of the fourth

degree on the first offense and a misdemeanor of the third degree on each subsequent offense. R.C. 4757.99. "R.C. 4757.02 impose[s] criminal liability upon a person for engaging in the practice of * * * professional counseling without proper licensure." *Anderson v. Eyman*, 5th Dist. Fairfield No. 00CA26, 2000 Ohio App. LEXIS 5982, 12 (Dec. 14, 2000).

{¶ 44} Here, Lakes referred to herself as a social worker when asked at the start of her testimony about her position at CCDCFS. When asked on cross-examination whether she was a social worker, Lakes replied that she was not and identified herself as a caseworker. The court overruled the agency's first objection to this line of inquiry but sustained a second objection when counsel for Mother asked, "Are you aware that you are breaking the law every time you present yourself as a social worker when you're not licensed?" The court subsequently noted Mother's proffer that Lakes's reference "goes to credibility," permitting counsel for Mother to explain that "R.C. 4757, I believe, is the statute that says that anyone that holds themselves out to be a social worker without being licensed is engaging in the unauthorized practice of social work." This interpretation is not entirely correct. The statute prohibits use of the title "social worker" in the practice of professional counseling without proper licensure. *Anderson* at 12. Also, the record shows that the juvenile court permitted counsel for Mother to question Lakes about her background, cut off the inquiry only when counsel alleged criminal liability, and noted counsel's proffer that Lakes's reference to herself as a social worker

undermined her credibility. That the juvenile court credited Lakes's testimony despite the reference is not a basis for reversal. *Davis* at 419.

{¶ 45} Mother adds that the reference implicates R.C. 2921.11(A) because Lakes made this statement under oath and therefore may have perjured herself. R.C. 2921.11(A) prohibits a person from knowingly making a false statement under oath in any official proceeding when that statement is material. *State v. Jacobozzi*, 6 Ohio St.3d 86, 88, 451 N.E.2d 749 (1983). R.C. 2921.11(B) provides that a false statement is material "if it can affect the course or outcome of the proceeding." *State v. Koury*, 8th Dist. Cuyahoga No. 52718, 1987 Ohio App. LEXIS 9116, 7 (Oct. 8, 1987) ("'[M]ateriality' is an essential element of perjury.").

> "The test for materiality is an objective one. By using the word 'can,' R.C. 2921.11(B) makes it irrelevant whether the false statement actually influenced or affected the decision-making process of the trier of fact. The standard is whether the false statement was capable of influencing the trier of fact on the issue before it. The materiality of a false statement is a question of fact."

*State v. Alhweiti*, 2017-Ohio-8886, 100 N.E.3d 1139, ¶ 20 (8th Dist.), quoting *State v. Smith*, 2015-Ohio-1736, 32 N.E.3d 517, ¶ 8 (8th Dist.).

{¶ 46} Here, Lakes admitted on cross-examination that she improperly referred to herself as a "social worker" and corrected her former testimony by saying that her actual title is "caseworker." As explained above, the court permitted counsel for Mother to pursue this line of questioning until she referenced Lakes's possible criminal liability under R.C. 4757.02. The court noted that Lakes had misspoke and accepted counsel's challenge to Lakes's credibility. The record also indicates that

several times, the court itself improperly referred to caseworkers as social workers, suggesting that "social worker" is a term used in a general sense to refer to a CCDCFS child protection service worker.

{¶ 47} The court's use of the term "social worker" was immaterial to the court's adjudication of G.T. as neglected and dependent. The extent to which this adjudication is based on a determination of Lakes's credibility or lack thereof is, as explained above, not a legitimate ground for reversal. *Davis*, 77 Ohio St.3d at 419, 674 N.E.2d 1159.

{¶ 48} Based on the foregoing, the record establishes that the juvenile court's finding of neglect was not against the manifest weight of the evidence.

{¶ 49} Accordingly, Mother's first assignment of error is overruled.

## B. Dependency of G.T.

{¶ 50} Within her second assignment of error, Mother contends that CCDCFS failed to establish any of the dependency factors under R.C. 2151.04, for the same reasons that it failed to prove that G.T. was neglected. Mother maintains that she secured housing with a friend and was not "homeless" as required by R.C. 2151.04(A); the agency failed to show that she suffered from a diagnosed mental health condition that would inhibit her ability to care for G.T. as required by R.C. 2151.04(B); nothing about G.T.'s condition or environment demanded guardianship by the state as required by R.C. 2151.04(C); and R.C. 2151.04(D) does not apply because the agency alleged no other acts of neglect or dependency, G.T. has no siblings, and no other children live in Mother's household. The agency argues that

the same evidence supporting the court's finding of neglect also supports the court's finding of dependency.

{¶ 51} R.C. 2151.04 defines a "dependent child" as any child

(A) Who is homeless or destitute or without adequate parental care, through no fault of the child's parents, guardian, or custodian;

(B) Who lacks adequate parental care by reason of the mental or physical condition of the child's parents, guardian, or custodian;

(C) Whose condition or environment is such as to warrant the state, in the interests of the child, in assuming the child's guardianship;

(D) To whom both of the following apply:

(1) The child is residing in a household in which a parent, guardian, custodian, or other member of the household committed an act that was the basis for an adjudication that a sibling of the child or any other child who resides in the household is an abused, neglected, or dependent child.

(2) Because of the circumstances surrounding the abuse, neglect, or dependency of the sibling or other child and the other conditions in the household of the child, the child is in danger of being abused or neglected by that parent, guardian, custodian, or member of the household.

{¶ 52} Whereas a finding of neglect under R.C. 2151.03(A)(2) requires some showing that the parent is at fault before the child can be found to lack adequate parental care, a finding of dependency under R.C. 2151.04(A) requires no showing of fault, but rather "focuses exclusively on the child's situation to determine whether the child is without proper (or adequate) care or support." *In re Riddle*, 79 Ohio St.3d at 262, 680 N.E.2d 1227. As noted above, "'[a]dequate parental care' means the provision by a child's parent or parents, guardian, or custodian of adequate food, clothing, and shelter to ensure the child's health and physical safety[.]" R.C.

2151.011(B)(1). The parent's conduct is relevant to a finding of dependency to the extent that it can be shown that the parent's conduct adversely impacts the child's environment enough to warrant state intervention. *In re Burrell*, 58 Ohio St.2d 37, 39, 388 N.E.2d 738 (1979). However, "'the child does not first have to be put into a particular environment before a court can determine that that environment is unhealthy or unsafe.'" *In re J.L.*, 8th Dist. Cuyahoga Nos. 85668, 85669, and 85670, 2005-Ohio-6125, ¶ 25, quoting *In re Burchfield*, 51 Ohio App.3d 148, 156, 555 N.E.2d 325 (4th Dist.1988). "'[T]he law does not require the court to experiment with the child's welfare to see if * * * [the child] will suffer great detriment or harm.'" *In re A.C.*, 6th Dist. Lucas No. L-10-1025, 2010-Ohio-4933, ¶ 75, quoting *Burchfield* at 156. As with a finding of neglect, the "court must determine that the circumstance(s) which support a finding of dependency * * * existed as of the date or dates alleged in the complaint.'" *In re E.E.*, 2021-Ohio-2770, at ¶ 41, quoting *In re C.O.*, 2013-Ohio-5239, at ¶ 31.

{¶ 53} Here, again, the relevant date is June 23, 2021, when CCDCFS filed its complaint. Although the focus is on G.T.'s environment, Mother's conduct is relevant insofar as it threatened to adversely impact G.T.'s environment enough to warrant intervention by CCDCFS.

{¶ 54} R.C. 2151.04(A) defines a dependent child as one who is homeless or without adequate parental care. When Mother was released from jail, she initially had no plan and told Lakes that she intended to live out on the street with G.T. Shortly after, Mother went to stay with a friend. G.T. remained with Grandmother.

At no time was G.T. homeless. Nor did the agency allege in the complaint that G.T. was in danger of homelessness. Lakes admitted that the friend offered to have Mother and G.T. stay with her and had food in the house. However, this testimony does not show how Mother intended to meet G.T.'s basic needs long-term. The record reveals that Mother did not have the means to provide for G.T. Before going to stay with her friend, Mother had relied on Grandmother for financial support and childcare for G.T. Mother continued to attend school during the day, remained unemployed, and was without government assistance to meet G.T.'s basic needs. It is immaterial that Grandmother continued to house and provide for G.T. after Mother went to stay with her friend. *See In re Doolan*, 8th Dist. Cuyahoga Nos. 64945 and 64946, 1994 Ohio App. LEXIS 919, 9 (Mar. 10, 1994) ("[T]he fact that relatives other than a parent are providing [the] care and support [owed to the child by the parent] is immaterial to the determination of whether a child is a 'dependent child'" under R.C. 2151.04.). The record therefore supports by clear and convincing evidence the juvenile court's finding that G.T. was without adequate parental care under R.C. 2151.04(A).

{¶ 55} R.C. 2151.04(B) also defines a dependent child as one who is without adequate parental care due to a mental condition of the parent. "A child may properly be found dependent under R.C. 2151.04(B) on the basis of its mother's emotional status, immaturity, inconsistent living arrangements, and inability to provide the child with basic needs." *In re Doolan* at 9, citing *In re Green*, 18 Ohio App.3d 43, 480 N.E.2d 492 (2d Dist.1984). While the agency has not proven that

Mother suffers from a diagnosed mental health disorder, the record does show that Mother twice threatened to kill herself and once threatened to kill G.T. when she believed that she might be separated from him. Mother is 19 years old and enrolled in high school. She lives with a friend who promised that Mother and G.T. can stay there. These living arrangements are not permanent or stable. Mother does not have employment income or financial assistance to meet G.T.'s basic needs and is forced to rely on a friend to provide what Grandmother currently provides to G.T. The record therefore supports by clear and convincing evidence the court's finding that G.T. is dependent under R.C. 2151.04(B).

{¶ 56} R.C. 2151.04(C) further defines a dependent child as one whose environment warrants state intervention. CCDCFS based its complaint of dependency, in part, on Mother's lack of stable housing and financial support and the incident of domestic violence between Mother and Grandmother while G.T. was in the home. *See In re H.H.*, 10th Dist. Franklin No. 19AP-158, 2019-Ohio-4953, ¶ 54-55 (lack of stable housing and income and domestic violence are factors for determining whether a child's is dependent under R.C. 2151.04(C)). The agency also based its complaint, in part, on Mother's "unresolved mental health issues which interfere with her ability to provide adequate parental care for [G.T.] and which jeopardize [G.T.'s] safety" because Mother had twice threatened to kill herself and G.T., the first time a few weeks prior and the second time the day before the agency filed its complaint. Suicidal and homicidal ideations create an unsafe environment that warrants agency intervention under R.C. 2151.04(C). *In re Ohm*, 4th Dist.

Hocking No. 05CA1, 2005-Ohio-3500, ¶ 33. The record therefore supports by clear and convincing evidence the juvenile court's finding that G.T. was dependent under R.C. 2151.04(C).

{¶ 57} R.C. 2151.04(D) does not apply to G.T.'s circumstances. To find a child dependent under R.C. 2151.04(D), "R.C. 2151.04(D)(1) plainly and unambiguously requires that a sibling of the child or any other child who resides in the household be adjudicated abused, neglected, or dependent before the complaint is filed." *In re S.L.*, 2016-Ohio-5000, 56 N.E.3d 1026, ¶ 20 (3d Dist.). G.T. has no siblings and was the only child residing with Mother and Grandmother at the time CCDCFS filed its complaint. Therefore, G.T. cannot be adjudicated dependent under R.C. 2151.04(D).

{¶ 58} A review of all the R.C. 2151.04 factors establishes that the juvenile court's finding of dependency under R.C. 2151.04(A), (B), and (C) was not against the manifest weight of the evidence.

{¶ 59} Accordingly, Mother's second assignment of error is overruled.

{¶ 60} Judgment is affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court, juvenile division, to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
MARY J. BOYLE, JUDGE

SEAN C. GALLAGHER, A.J., and
EILEEN T. GALLAGHER, J., CONCUR