[Cite as *In re T.F.*, 2025-Ohio-5051.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

|  |  |  |
|---|---|---|
| IN RE T.F., ET AL. | : | |
| | : | No. 115224 |
| Minor Children | : | |
| | : | |
| [Appeal by S.F., Mother] | : | |

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** November 6, 2025

Civil Appeal from the Cuyahoga County Court of Common Pleas
Juvenile Division
Case Nos. AD23914281 and AD23914282

***Appearances:***

Judith M. Kowalski, *for appellant.*

Michael C. O'Malley, Cuyahoga County Prosecuting
Attorney, and Joseph C. Young, Assistant Prosecuting
Attorney, *for appellee.*

DEENA R. CALABRESE, J.:

{¶ 1} Appellant S.F. ("mother") appeals two judgments of the Cuyahoga County Court of Common Pleas, Juvenile Division ("juvenile court"), entered May 29, 2025. The juvenile court judgments granted permanent custody of mother's two children, M.R. and T.F. ("the children"), to appellee Cuyahoga County Division of Children and Family Services ("CCDCFS" or "the agency") pursuant to

R.C. 2151.353(A)(4), thereby terminating mother's parental rights.[1] After reviewing the facts of the case and pertinent law, we affirm the juvenile court's judgment.

## I. Facts and Procedural History

{¶ 2} The children were removed by law enforcement on December 26, 2023, based on allegations of child endangerment. At the time of removal, M.R. was two years old and T.F. was 21 days old. The children had been left unattended by mother, who was detained in county jail. On December 27, 2023, the agency filed a complaint alleging that the children were neglected and dependent and requesting a dispositional order of temporary custody to the agency. Following an emergency hearing the same day, the children were committed to the emergency custody of the agency. On January 10, 2024, mother entered into a contract for participation in the Family Recovery Court ("drug court").

{¶ 3} Mother appeared in court with counsel on March 26, 2024, and admitted to the allegations of the complaint as amended. Mother admitted to having mental-health issues and marijuana-use disorder, both of which affected her ability to provide safe and appropriate care for the children. The juvenile court docketed entries the same day adjudicating the children to be dependent and ordering them placed in the temporary custody of the agency.

{¶ 4} Despite warnings that failure to comply with drug-court protocols might lead to termination from those services, mother failed to comply with orders and requirements, including failing to enter into residential drug treatment and

---

[1] The children's father has not appealed the juvenile court's judgments.

failing to submit to required drug screens. By order dated April 2, 2024, the juvenile court discharged mother from the drug court program.

{¶ 5} On October 4, 2024, the agency filed a motion to modify temporary custody to permanent custody. The juvenile court held the dispositional trial on May 13, 2025. At that time, M.R. was age three and T.F. was age one.

{¶ 6} At the trial, the juvenile court heard testimony from CCDCFS case worker Sarah Heggs, CCDCFS START advocate Alesia Hankins, and the children's maternal great-grandmother ("MGGM").[2] The juvenile court also received four CCDCFS exhibits, including the report of the children's guardian ad litem ("GAL"). All exhibits were admitted without objection.

{¶ 7} CCDCFS case worker Heggs testified to the December 2023 removal from mother's care by law enforcement following a telephone report "regarding child endangerment charges." (Tr. 10.) She further indicated that the children have been in uninterrupted CCDCFS custody since their removal in December 2023. Upon investigation, the agency determined that appellant had substance-abuse issues and inadequate housing. The agency developed and implemented a family case plan designed to promote a permanency plan of reunification. The plan included services for mother aimed at addressing substance abuse, mental health, anger issues, housing, the provision of basic needs, and parenting skills.

---

[2] "START" is an acronym for Sobriety Treatment and Recovery Team, which Hankins described as a "chemical dependency department." (Tr. 49.)

**{¶ 8}** With respect to mother's substance abuse, Heggs testified that mother used marijuana excessively. She testified that both mother and T.F. tested positive for marijuana at the time of T.F.'s birth. Heggs confirmed that while the agency had engaged mother in the drug court program, she was ultimately discharged for noncompliance. Mother was referred for substance abuse assessment on four occasions to three different providers. While mother completed one assessment through Signature Health in July 2024, she failed to complete the recommended intensive outpatient treatment program and was thereafter discharged in October 2024. She returned to Signature Health for mental-health services, but she refused further treatment for substance abuse.

**{¶ 9}** Mother's mental-health services were designed to address her "historical diagnoses" of bipolar disorder, depression, anxiety, and borderline personality disorder. (Tr. 13.) Heggs characterized mother as having "disorganized thinking" and being easily distracted from her obligations. (Tr. 17.) Mother completed an assessment through Signature Health and began counseling services, but Heggs characterized her engagement as "very spotty." (Tr. 15.) In other words, mother would "engage, and then she would kind of disappear. And then she would engage, and then kind of disappear." (Tr. 15.) As a result, mother "has been discharged more than once" from services and "is considered as being noncompliant." (Tr. 15.) Mother was "recommended for medication" for her mental-health issues, but did not take prescribed medication because "[s]he just doesn't feel that she needs it." (Tr. 16-17.)

{¶ 10} Mother likewise made little progress with respect to anger management, which was included in the case plan because she "gets triggered very easily," which results in agitation, "yelling," and "cussing." (Tr. 17.) Also, "throughout the case, [mother] has had different instances where she has [become] very upset and aggressive." (Tr. 17.) Such behavior, Heggs testified, had occurred in the presence of the children. Heggs believed mother would benefit from separate anger-management counseling but was unlikely to be willing to participate in it. Heggs testified she continued to interact with mother and continued to see her become easily agitated.

{¶ 11} At this point in the trial, mother absented herself from the proceedings. The juvenile court stated on the record that "mother has just left the courtroom in a state of agitation." (Tr. 19-20.) Heggs continued her testimony, indicating that mother had not made significant progress in addressing the anger-management and other mental-health components of her case plan and that Heggs did not believe she would do so within a reasonable time.

{¶ 12} Heggs further testified that mother had not demonstrated the ability to obtain and maintain stable and appropriate housing, despite being provided with resources through the agency. While it appeared to Heggs that mother had attempted to follow through on the referrals, Heggs was never able to verify a current address for her. Heggs testified that when she asks mother where she is living, mother "states that she is just staying at some friends' homes." (Tr. 23.) With respect to previous living arrangements, at one point mother indicated she was

living with her own mother (i.e., the children's maternal grandmother), but the grandmother refused access to the home. Mother did not, to Heggs's knowledge, have a source of income, and Heggs did not believe she could meet their basic needs. In addition to any verifiable income, mother had made no significant progress with respect to housing and was not likely to do so within a reasonable time.

{¶ 13} With respect to father's involvement, Heggs testified that he has established paternity but "refuses to engage" with the agency or as a party to the case. (Tr. 24.) Attempts to contact him were unsuccessful. According to Heggs, father provided no financial support for the children since their December 2023 removal and had contact with them only once, approximately six months before the dispositional trial.

{¶ 14} Mother's attendance at weekly supervised visits with the children was consistent "[w]ithin the last two months," but was inconsistent prior to that time. (Tr. 25-26.) During that prior period of inconsistency, mother "would show up late to visits." (Tr. 26.) When she failed to appear, her absence was usually unexplained — i.e., she would "state she is coming and then doesn't arrive." (Tr. 27.) On those occasions, T.F. was unbothered but M.R. became "very emotionally distraught and inconsolable." (Tr. 27.) Heggs indicated that both children "very much love" mother, that she is "well bonded with them," and that she was generally attentive during visits, but mother would occasionally become distracted if she received a phone call. (Tr. 28.) Heggs indicated the calls occurred "[p]retty much every visit" and consumed "about 30 to 45 minutes" of the designated two-hour visitation

period. (Tr. 28.) Heggs ruled out unsupervised visits because of mother's continued lack of sobriety, testifying that the agency required "a minimum of . . . five months of sobriety to even introduce unsupervised visits." (Tr. 28.) At the time of trial, mother had no projected sobriety date. (Tr. 31.) The lack of progression to unsupervised visits, Heggs testified, ruled out any recommendation of reunification.

{¶ 15} Heggs further testified that the children had been placed with a maternal aunt upon removal, but the aunt would not continue the placement because she felt overwhelmed because of the lack of family support and also wanted to pursue higher education. While the children still visited the aunt on weekends, she informed the agency she would be willing to accept legal custody of only one child (one-year-old T.F.), not both children. Heggs testified that the agency believed it would not be in the best interest of the children to be separated, but "if they are within the same family," that "would be appropriate." (Tr. 33.)

{¶ 16} While the agency was therefore willing to consider placing each child with separate relatives, no other relative other than the aunt was available and appropriate despite the agency's efforts to identify suitable relatives. Both MGGM and the children's maternal grandmother had been aware of the removal when it occurred in December 2023, but neither began cooperating with the agency until March 2025, roughly two months before the trial, with no explanation for the delay. (Tr. 36.) MGGM had phone contact with the agency in 2024 and had completed foster care classes, but "she was not willing to provide the Agency with" a residential address. (Tr. 36.) She had appeared before the juvenile court at a hearing held

January 10, 2025, to express her interest in adopting the children, but she did not follow up with the agency for purposes of assessment and was not visiting with the children at the time of trial. Concerns as to MGGM's health had also been brought to the agency's attention, and the agency was concerned about the maternal grandmother's "amount of prior eviction notices." (Tr. 36.)

{¶ 17} Heggs testified that while MGGM might be appropriate for consideration in the future, she had not cooperated sufficiently by the time of trial to qualify as a candidate. Heggs explained that MGGM had been looking for housing in Ohio "[s]ince the end of last year" without success, and that there was no certainty she would secure appropriate housing within a reasonable time. (Tr. 47.)[3] Pressed on cross-examination with respect to any efforts she made to assist MGGM with relocating from California to Ohio, Heggs testified that "as an Agency, it's not my job to assist with finding or assisting housing with people who are not a direct party of the case" and that MGGM did not keep in touch with her during her purported housing search. (Tr. 40.) The agency also had continuing health concerns regarding MGGM, and the housing stability of the maternal grandmother was an issue because of "the amount of prior eviction notices that she has." (Tr. 36.)

---

[3] At a hearing held on March 24, 2025, Heggs testified that after the agency concluded that the maternal aunt was not interested in permanent placement of both children, it had continued to seek other appropriate relatives, but none proved to be appropriate. This included MGGM and the maternal grandmother. Following the March 2025 hearing, the juvenile court issued a journal entry finding that the children could not be placed with relatives because "[n]o relatives are willing and able to provide substitute care," that "[s]uitable relatives cannot be located," and that "CCDCFS has made intensive efforts to locate relatives for placement purposes."

{¶ 18} While the children were on their third placement since removal, the last placement had lasted approximately six months by the time of trial, and Heggs testified the children were "very well bonded with their foster family." (Tr. 31-33.) At the time of trial, the children were in a respite placement "for the next week or so" because of a foster caregiver's surgery. (Tr. 42-43.) Heggs testified that the agency asked the maternal aunt to serve as a respite placement, but she declined because of her schedule. (Tr. 42-43.)

{¶ 19} CCDCFS START advocate Hankins testified that she was assigned to mother's case in March 2024. A previous advocate had referred mother to drug court, but mother was discharged for noncompliance. Hankins testified that mother was referred for four substance-abuse assessments. She completed one and was recommended for intensive outpatient treatment, but failed to complete it. She likewise failed to complete an intensive outpatient treatment program with another provider, resulting in her discharge on October 30, 2024. She returned to that provider for mental-health services, but she refused to engage in intensive outpatient treatment.

{¶ 20} In late April 2025, mother's therapist indicated mother was being re-enrolled in intensive outpatient substance-abuse treatment, but mother missed an entire week of treatment and was not compliant with respect to drug screens. With respect to mother's overall compliance with substance-abuse treatment, Hankins testified that even though mother had been given "transportation to complete drug tests," such as bus tickets, "she has not done it on a regular basis. She has missed

39 agency-required drug tests since the case opened" and had "completed absolutely none" in 2025. (Tr. 54.) Hankins testified that mother also failed to provide any documentation of her required attendance at 12-step meetings. Hankins testified that the agency looks for a minimum of six months of sobriety before moving forward towards reunification and that it had "no sobriety date" for mother. (Tr. 54-55.) The agency did not anticipate that mother's situation would change within a reasonable time because mother "does not have any desire to do so." (Tr. 55.) Finally, Hankins said she spoke with mother earlier in the day, before trial began, and that mother had a peppermint in her mouth but "smelled like alcohol." (Tr. 56.)

{¶ 21} Mother called one witness: MGGM, who briefly testified over the agency's objection.[4] MGGM testified that she had no significant health limitations, that she was able to care for the children, and that she visited the children on weekends when they were with their maternal aunt. She further testified that she owned a home in Cleveland Heights prior to relocating to California approximately 15 years ago and that she still worked as an adjunct professor at UCLA. She testified that she was living with her daughter (the maternal grandmother of the children) while continuing to look for a residence in Ohio.

{¶ 22} The GAL confirmed that, consistent with his written report, he continued to recommend a disposition of permanent custody to the agency. In his

---

[4] MGGM did not appear on a witness list and had therefore not been separated as a witness during the dispositional trial. Prior to permitting mother to call MGGM as a witness, the juvenile court took a recess to meet in chambers with counsel. It thereafter permitted MGGM to provide testimony of "limited scope" despite the agency's objection. (Tr. 62.)

report, the GAL stated that mother's "lack of consistent engagement in Case Plan services has prevented her from developing into a stable parenting figure." The GAL further indicated in his written report that a grant of permanent custody to the agency would allow it "to provide [the children] with multiple permanency options suited to their needs." Neither party directed any questions to the GAL.

{¶ 23} The juvenile court heard closing arguments and took the matter under advisement. On May 29, 2025, it issued a detailed entry in each child's case terminating mother's parental rights and committing each child to the permanent custody of the agency. This timely appeal followed.

## II. Assignments of Error

{¶ 24} Mother presents three assignments of error for our review:

First Assignment of Error: The decision by the Cuyahoga County juvenile court granting permanent custody of the child to the Cuyahoga County Division of Children and Family Services was against the manifest weight of the evidence.

Second Assignment of Error: The evidence was insufficient to support permanent custody of the child to the Cuyahoga County Division of Children and Family Services.

Third Assignment of Error: The agency failed to sufficiently explore potential placements for the child which should have precluded seeking permanent custody.

{¶ 25} Finding no merit to any of mother's assignments of error, we affirm the juvenile court's judgments.

**III. Analysis**

**A. First and Second Assignments of Error**

{¶ 26} This court has acknowledged that while the right to raise one's own children is an essential, basic civil right, that right is not absolute, but is instead subordinate to the welfare of the children:

> [T]he right to raise one's own child is "an 'essential' and 'basic civil right.'" *In re Murray*, 52 Ohio St.3d 155, 156, 556 N.E.2d 1169 (1990), quoting *Stanley v. Illinois*, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); *In re B.B.C.*, 2024-Ohio-588, ¶ 14, 236 N.E.3d 417 (8th Dist.). "Parents have a 'fundamental liberty interest' in the care, custody, and management of the child." *Id.*, quoting *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982). This right, however, is not absolute. "'The natural rights of a parent are not absolute, but are always subject to the ultimate welfare of the child, which is the polestar or controlling principle to be observed.'" *In re Cunningham*, 59 Ohio St.2d 100, 106, 391 N.E.2d 1034 (1979), quoting *In re R.J.C.*, 300 So.2d 54, 58 (Fla. App. 1974).

*In re Z.H.*, 2025-Ohio-2596, ¶ 12 (8th Dist.).

{¶ 27} With respect to the standard of review for permanent-custody decisions, the Ohio Supreme Court has stated:

> [T]he proper appellate standards of review to apply in cases involving a juvenile court's decision under R.C. 2151.414 to award permanent custody of a child and to terminate parental rights are the sufficiency-of-the-evidence and/or manifest-weight-of-the-evidence standards, as appropriate depending on the nature of the arguments that are presented by the parties.

*In re Z.C.*, 2023-Ohio-4703, ¶ 18. In this case, mother's arguments pertaining to her first assignment of error (manifest weight) incorporate sufficiency concepts. In addition, mother's arguments supporting her second assignment of error (sufficiency) are repetitious of her manifest-weight arguments and are confined to

merely two pages of her brief. Finally, "[a]lthough sufficiency and manifest weight are distinct legal concepts, a finding that a judgment is supported by the manifest weight of the evidence necessarily includes a finding that sufficient evidence supports the judgment." *In re R.M.*, 2024-Ohio-1885, ¶ 46 (8th Dist.), citing *In re P.S.*, 2023-Ohio-144, ¶ 30 (8th Dist.). We therefore address mother's first and second assignments of error together under a manifest-weight-of-the-evidence standard. *See In re Z.H.* at ¶ 13 (faced with sufficiency and manifest-weight arguments, court indicated it would "review this matter under the manifest-weight-of-the-evidence standard").

{¶ 28} "A juvenile court's decision to grant permanent custody will not be reversed as being against the manifest weight of the evidence when the record contains competent, credible evidence by which it could have found that the essential statutory elements for an award of permanent custody have been established." *In re A.M.*, 2024-Ohio-1168, ¶ 15 (8th Dist.), citing *In re B.M.*, 2020-Ohio-4756, ¶ 11 (8th Dist.). When reviewing a manifest-weight challenge, we "must weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether, in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered." *In re Z.C.* at ¶ 14, citing *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 20; *see also In re J.F.*, 2024-Ohio-3311, ¶ 14 (8th Dist.). "We will not reverse a juvenile court's termination of parental rights and award of permanent custody to an agency unless the judgment is not supported by

clear and convincing evidence." *In re S.H.*, 2019-Ohio-3575, ¶ 25 (8th Dist.), citing *In re N.B.*, 2015-Ohio-314, ¶ 48 (8th Dist.); *see also In re M.J.*, 2013-Ohio-5440, ¶ 24 (8th Dist.).

{¶ 29} In a case centered on child custody, the Ohio Supreme Court has emphasized the importance of affording appropriate deference to the finder of fact:

> "The underlying rationale of giving deference to the findings of the trial court rests with the knowledge that the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984). "'If the evidence is susceptible of more than one construction, the reviewing court is bound to give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the verdict and judgment.'" *Id.* at fn. 3, quoting 5 Ohio Jurisprudence 3d, Appellate Review, Section 603, at 191-192 (1978).

*In re Z.C.* at ¶ 14.

{¶ 30} Under R.C. 2151.414(B)(1), a juvenile court may grant permanent custody of a child to the agency that moved for permanent custody if the court determines, "by clear and convincing evidence, that it is in the best interest of the child" to do so and that one of five factors enumerated in R.C. 2151.414(B)(1)(a) through (e) applies. *In re Z.C.*, 2023-Ohio-4703, at ¶ 7. The Ohio Supreme Court has stated:

> "Clear and convincing evidence is that measure or degree of proof which is more than a mere 'preponderance of the evidence,' but not to the extent of such certainty as is required 'beyond a reasonable doubt' in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established."

*Id.*, quoting *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus. *See also In re A.M.*, 2025-Ohio-752, ¶ 14 (8th Dist.).

{¶ 31} Under this statutory framework, the juvenile court's analysis on a motion for permanent custody consists of two steps. The juvenile court must first find the existence of one of the five conditions specified in R.C. 2151.414(B)(1):

(a) The child is not abandoned or orphaned, has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period if, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.

(b) The child is abandoned.

(c) The child is orphaned, and there are no relatives of the child who are able to take permanent custody.

(d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state.

(e) The child or another child in the custody of the parent or parents from whose custody the child has been removed has been adjudicated an abused, neglected, or dependent child on three separate occasions by any court in this state or another state.

R.C. 2151.414(B)(1)(a)-(e).

{¶ 32} Once the juvenile court has determined that any one of the specified conditions exists, it then must determine whether permanent custody is in the best interest of the child in light of the factors specified in R.C. 2151.414(D):

> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
>
> (b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
>
> (c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state;
>
> (d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;
>
> (e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

R.C. 2151.414(D)(1)(a)-(e).[5]

{¶ 33} In satisfaction of R.C. 2151.414(B)(1)(a), the juvenile court found that the children "cannot be placed with one of the child's parents within a reasonable time or should not be placed with either parent" based on findings pursuant to R.C.

---

[5] This juvenile court confined its analysis to the best-interest factors enumerated in R.C. 2151.414(D)(1). The facts in this case did not trigger R.C. 2151.414(D)(2). *See In re T.B.*, 2025-Ohio-2075, ¶ 37 (8th Dist.); *In re P.J.*, 2021-Ohio-1821, ¶ 26 (8th Dist.).

2151.414(E). "A juvenile court is only required to find that one of [the R.C. 2151.414(E)] factors is met in order to properly find that a child cannot or should not be placed with a parent." *In re Y.F.*, 2024-Ohio-5605, ¶ 43 (8th Dist.), citing *In re Ca.T.*, 2020-Ohio-579, ¶ 27 (8th Dist.).

{¶ 34} Here, the juvenile court found the existence of statutory factors R.C. 2151.414(E)(1) and (4) with respect to mother, namely, failure to remedy the conditions that led to removal and a demonstrated lack of commitment to the children. The juvenile court also found, pursuant to R.C. 2151.414(E)(10), that father had abandoned the children.[6]

{¶ 35} In accordance with R.C. 2151.414(E)(1), the juvenile court found as to each child:

> Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home.

{¶ 36} Ample record evidence supports the existence of this factor. Following the children's removal by law enforcement, the agency developed and implemented a case plan with the goal of reunification. Mother received several referrals to address her substance-abuse and mental-health issues, as well as her issues with anger management, parenting, housing, and provision of basic needs for

---

[6] The juvenile court found that while father had established paternity, he "refuses to have contact with CCDCFS" and has had only "one contact with the children since their removal." Father has not appealed the juvenile court's orders.

the children. Nearly a year and a half following removal, she had not made appreciable progress towards resolving those issues. She had no prospective sobriety date because she had no interest in sobriety. On the day of trial, witness Hankins testified mother smelled of alcohol. She missed 39 drug screens and had not submitted to any drug tests in 2025. The testimony was consistent that mother's numerous issues could not be resolved within a reasonable time.

{¶ 37} Mother had to absent herself during a portion of the dispositional trial, with the court noting her agitation on the record. She failed to consistently engage in mental-health treatment, was labeled noncompliant, and was discharged from services more than once. She declined prescription medication for mental-health symptoms, explaining she did not feel she needed it. She had failed to take any measurable steps towards establishing appropriate housing, despite the agency's efforts to provide assistance, and caseworker Heggs testified it did not appear she would make further significant progress within a reasonable time. Mother never provided the agency with a residential address, instead reporting that she stayed with friends. She had no reported income or any way of meeting the basic needs of the children. Finally, in his report, the GAL stated that mother's "lack of consistent engagement in Case Plan services has prevented her from developing into a stable parenting figure."

{¶ 38} Upon our independent review of the record, including the trial transcript and exhibits, we find that ample evidence supports the juvenile court's

finding that mother had failed to remedy the conditions leading to the children's removal.

{¶ 39} The juvenile court's entries as to each child also included findings pursuant to R.C. 2151.414(E)(4) that mother "has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child." The evidence supporting the juvenile court's findings under subdivision (E)(1) likewise support its findings under subdivision (E)(4). Despite multiple referrals, mother failed to complete substance-abuse programs, failed to consistently engage in mental-health services, and did not address her continued lack of stable housing. On this record, she exhibited virtually no interest in working towards providing the children with an adequate permanent home or in otherwise resolving the issues standing in the way of reunification.

{¶ 40} Moreover, while mother's attendance at scheduled supervised visits with the children became more regular shortly before trial, her prior attendance had been inconsistent. She sometimes appeared late. She sometimes failed to appear entirely and without notice, which left M.R., her older child, inconsolable. When mother did appear for scheduled visits, she would occasionally become distracted by a phone call and spend more than one-quarter of the two-hour visit on the phone rather than devoting her attention to the children. At the time of trial, mother had not taken the necessary steps to progress beyond supervised visits, and there was no expectation that she could make additional substantial progress and achieve

reunification within a reasonable time. As with the juvenile court's findings under R.C. 2151.414(E)(1), we find that the juvenile court's lack-of-commitment finding under R.C. 2151.414(E)(4) is supported by the record.

{¶ 41} Our independent review therefore confirms that the juvenile court's determination that one or more of the R.C. 2151.414(E) factors exist is supported by the record.[7] Because the juvenile court found that the specified R.C. 2151.414(E) factors applied, it was required to enter a finding that the children could not or should not be returned to mother. The statute states that "[i]f the court determines, by clear and convincing evidence . . . that one or more of the [the enumerated] factors exist as to each of the child's parents, the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent[.]" *Id. See also In re Glenn*, 139 Ohio App.3d 105, 113 (8th Dist. 2000).

{¶ 42} The juvenile court also found "by clear and convincing evidence that it is in the best interest of the [children] to grant permanent custody to the agency that filed the motion for permanent custody." It expressly listed all factors under R.C. 2151.414(D)(1)(a) through (e), finding that each factor in subsections (D)(1)(a) through (d) supported permanent custody and that the factor specified in (D)(1)(e) applied specifically to father because of his abandonment of the children. When analyzing the best interest of the child, "[t]here is not one element that is given

---

[7] We note that mother has not contested the juvenile court's R.C. 2151.414(E) findings. As discussed more fully below, her arguments are limited to the timing of the permanent-custody motions, placement history, and credibility issues.

greater weight than the others pursuant to the statute." *In re Schaefer*, 2006-Ohio-5513, ¶ 56. Furthermore, "[t]he Ohio Supreme Court has held that 'R.C. 2151.414(D)(1) does not require a juvenile court to expressly discuss each of the best interest factors in R.C. 2151.414(D)(1)(a) through (e). Consideration is all the statute requires.'" *In re M.B.*, 2024-Ohio-6028, ¶ 30 (8th Dist.), quoting *In re A.M.*, 2020-Ohio-5102, ¶ 31. *See also In re A.M.*, 2025-Ohio-752, at ¶ 21 (8th Dist.).

{¶ 43} The juvenile court's decision indicates it considered the required statutory factors with respect to the best interests of the children. Our independent review confirms that the juvenile court's best-interest determination is supported by the record.

{¶ 44} R.C. 2151.414(D)(1)(a) relates to interactions and relationships between children and other significant individuals in their lives, including parents, siblings, other relatives, and foster caregivers. Mother's interactions with the children were discussed in detail above. The record established that mother was inconsistent in keeping to the supervised visitation schedule shortly before trial, sometimes appearing late or not at all. Her previous failures to appear without notice left M.R. "emotionally distraught" and "inconsolable." Mother's visits were also marked by substantial periods of distraction because of phone calls; these lasted not mere moments, but often 30 to 45 minutes of each two-hour visit. Father had been in contact with the children only once since their removal in December 2023.

{¶ 45} The evidence did establish that the children visited their aunt on weekends, and caseworker Heggs testified that the children clearly loved their

mother. Mother had not, however, progressed even to the point of unsupervised visits by the time of trial. This court has previously written that "'[a] child's best interests require permanency and a safe and secure environment.'" *In re K.M.*, 2011-Ohio-349, ¶ 23 (8th Dist.), quoting *In re Holyak*, 2001 Ohio App. LEXIS 3105, *10 (8th Dist. July 12, 2001). "'[T]he mere existence of a good relationship is insufficient,'" because "'[o]verall, we are concerned with the best interest of the child, not the mere existence of a relationship.'" *Id.*, quoting *In re R.N.*, 2004-Ohio-2560, ¶ 37 (8th Dist.). Indeed, a child's relationship with "biological family" can be "outweighed by [the child's] right to a stable and permanent home." (Cleaned up.) *In re K.M.* at ¶ 23.

{¶ 46} The juvenile court expressly found that "[t]his factor weighs in favor of permanent custody." Its conclusion is supported by the record.

{¶ 47} R.C. 2151.414(D)(1)(b) deals with the wishes of the children. At the time of trial, the children were three years old and one year old. The juvenile court found that they were "too young to express wishes," which aligns with precedent holding that children of this age "are too young to express an opinion on their wishes." *In re Harlston*, 2003-Ohio-282, ¶ 44 (8th Dist.). The GAL, however, recommended permanent custody to the agency. This court has previously held that in relation to this factor, consideration of the GAL's recommendation is appropriate. *In re R.A.*, 2021-Ohio-4126, ¶ 52 (8th Dist.). The juvenile court expressly stated that the "GAL recommends permanent custody as a being in [each] child's best interest." An independent review of the GAL's report confirms the juvenile court's conclusion.

The juvenile court did not err in finding that this factor weighed in favor of permanent custody.

{¶ 48} The factor addressed in R.C. 2151.414(D)(1)(c), custodial history, bears little discussion. It is undisputed that the children were removed from mother's care by law enforcement in December 2023 and had been in temporary custody of the agency for almost a year and a half at the time of trial. The juvenile court did not err when it expressly found that "[t]his factor weighs in favor of permanent custody."

{¶ 49} R.C. 2151.414(D)(1)(d) concerns the child's need for a legally secure placement, and whether such a placement can be achieved without a grant of permanent custody. As discussed above, the juvenile court's determination that the children could not be placed with a parent within a reasonable time or should not be placed with either parent was supported by findings consistent with R.C. 2151.414(E), any of which mandate that legal conclusion. Furthermore, "a trial court's finding that it cannot or should not place a child with a parent precludes the court from considering returning the child to Mother's custody." *In re T.S.*, 2024-Ohio-827, ¶ 61 (8th Dist.). Here, the children had been in agency custody for almost a year and a half at the time of trial, with mother making no significant progress on her case plan. This supported the trial court's finding that it could not extend temporary custody. The juvenile court wrote:

> Pursuant to RC 2151.415(D), the Court cannot find by clear and convincing evidence that an extension of temporary custody is in the best interest of the child, that there has been significant progress on the

case plan, and that there is reasonable cause to believe that the child will be reunified with one of the parents or otherwise permanently placed within the period of extension. Therefore, the Court cannot extend temporary custody in this matter.

{¶ 50} Moreover, as the agency notes — and pertinent to one of mother's arguments on appeal — no motion had been filed requesting that the juvenile court order the children placed in the legal custody of a relative or other individual.  The juvenile court noted the lack of any such motion during the trial itself and further stated in each child's dispositional order that "[n]o relatives have filed for or been identified in a written motion for legal custody."  On this record, the juvenile court did not err when it concluded that this factor favored permanent custody to the agency.

{¶ 51} Finally, R.C. 2151.414(D)(1)(e) required the juvenile court to consider "[w]hether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child."  The juvenile court found that this factor applied to father based on its determination that he had abandoned the children.  That finding, which has not been challenged, is supported by the record based on father's continued failure to support or have contact with the children.  This factor therefore supported permanent custody as found by the juvenile court.

{¶ 52} For each child, the juvenile court considered the R.C. 2151.414(D)(1) factors and found "by clear and convincing evidence that it is in the best interest of the child to grant permanent custody to the agency."  The juvenile court's entries reflect that it complied with its statutory obligation to consider each factor.  We have

independently reviewed the entire record and find ample support for the juvenile court's determinations.

{¶ 53} We reiterate that "[a] juvenile court's decision to grant permanent custody will not be reversed as being against the manifest weight of the evidence when the record contains competent, credible evidence by which it could have found that the essential statutory elements for an award of permanent custody have been established." *In re A.M.*, 2024-Ohio-1168, at ¶ 15 (8th Dist.), citing *In re B.M.*, 2020-Ohio-4756, at ¶ 11 (8th Dist.). The record here contains ample competent, credible evidence supporting the juvenile court's findings as to each essential statutory element for an award of permanent custody. Mother's arguments for reversal, by contrast, are unpersuasive.

{¶ 54} Mother suggests that the agency requested permanent custody prematurely because the children had only been in agency custody for just over nine months at the time it filed its motion for permanent custody on October 4, 2024. This argument ignores the agency's statutory obligation, under R.C. 2151.415(A), to file a motion for disposition "not later than thirty days prior to the earlier of the date for the termination of the custody order pursuant to division (H) of section 2151.353 of the Revised Code or the date set at the dispositional hearing for the hearing to be held pursuant to this section[.]" By statute, temporary custody "shall terminate one year after the earlier of the date on which the complaint . . . was filed or the child was first placed into shelter care," R.C. 2151.353(G), and by early October 2024 that deadline was fast approaching. Even then, by virtue of the same statute, mother

essentially received an extension of temporary custody until the dispositional trial: R.C. 2151.353(G) provides that "upon the filing of a motion pursuant to section 2151.415 of the Revised Code, the temporary custody order shall continue and not terminate until the court issues a dispositional order under that section." The record reflects that the agency continued its efforts to prod mother into working on her case plan during the nearly eight months between the October 2024 motion for permanent custody and the May 2025 dispositional trial. The juvenile court, on the record, even encouraged mother to engage in services during a March 24, 2025 hearing nearly two months before the dispositional trial. As a result, even if the agency's motion seeking permanent custody was premature, which it was not, mother suffered no prejudice.

{¶ 55} Mother also criticizes the children's placement history, arguing they had been in "not less than four (4) foster care placements" or "at least four placements" since their removal. (Mother's brief at p. 17 and 20.) According to the record, however, the current placement, which had lasted several months, was only their third placement. At the time of the dispositional trial, they were temporarily in respite care while their foster mother was recovering from surgery, a recovery estimated to take approximately one week. In addition, while mother characterizes these placements as failures, she downplays the fact that the first placement was with the children's maternal aunt, which the aunt terminated because of the lack of familial support.

{¶ 56} As discussed above, mother's surprise witness, MGGM, was permitted to testify over the agency's objection. The juvenile court ultimately held that "[t]here was contradictory testimony about this visitation between the case worker and the maternal great grandmother" and found "the testimony of the caseworker to be more credible on this point." "An appellate court should defer to the juvenile court's credibility determinations, particularly in matters involving children, because there may be much evident in the parties' demeanor and attitude that does not translate to the record well." (Cleaned up.) *In re G.T.*, 2022-Ohio-1406, ¶ 25 (8th Dist.); *In re C.O.*, 2013-Ohio-5239, ¶ 30 (8th Dist.); *Davis v. Flickinger*, 77 Ohio St.3d 415, 418 (1997).

{¶ 57} Moreover, on close inspection, mother's arguments as to MGGM relate less to conflicting testimony on visitation than to MGGM's purported interest in adopting the children. Mother argues that the juvenile court's orders were erroneous because the agency is willing to continue considering the children's relatives for adoption, and MGGM's testimony appeared to have been presented to allay concerns regarding her health and her ultimate relocation to Ohio. Mother, however, had never filed a motion requesting that legal custody be granted to MGGM or any other relative. The trial court noted the absence of any such motion on the record and in its journal entries. Moreover, any such motion would have required a statement of understanding pursuant to R.C. 2151.353(A)(3). No statement of understanding appears on the docket. The juvenile court lacked the authority to grant MGGM legal custody when no one moved for legal custody. *In re*

*Ez.D.*, 2021-Ohio-3041, ¶ 17 (8th Dist.). Furthermore, while MGGM had earlier expressed interest in adopting the children, she did not express such interest, or any interest in legal custody, at the dispositional trial.

{¶ 58} Mother claims that MGGM and the maternal aunt were "willing and interested in taking custody of the children." (Mother's brief at p. 19.) Even if this were supported by the record, the Ohio Supreme Court has stated that a juvenile court's duty in considering a motion for permanent custody does not "include the requirement that the juvenile court find by clear and convincing evidence that no suitable relative was available for placement." *In re Schaefer*, 2006-Ohio-5513, at ¶ 64. In fact, the statutory framework "does not make the availability of a placement that would not require a termination of parental rights an all-controlling factor," and "[t]he statute does not even require the court to weigh that factor more heavily than other factors." *Id.* This court has likewise stated:

> The willingness of a relative to care for a child does not alter what a court considers in determining whether to grant permanent custody. . . . The court is not required to favor a relative if, after considering all R.C. 2151.414(D) factors, it is in the child's best interest for the agency to be granted permanent custody.

(Internal citations omitted.) *In re E.C.*, 2016-Ohio-4870, ¶ 39 (8th Dist.).

{¶ 59} Mother's additional arguments are likewise unavailing. She claims that as a young parent, she might eventually overcome her mental health and other difficulties with the benefit of additional time. This improperly shifts the ultimate focus to mother rather than the children. R.C. 2151.414(C) provides in pertinent part that in making its determinations, a juvenile court "shall not consider the effect the

granting of permanent custody to the agency would have upon any parent of the child." The Tenth District succinctly rejected arguments similar to mother's — i.e., that she was very young and should have additional time to work towards reunification — writing that such arguments "find no support in the legislative language that the General Assembly actually used in establishing public policy in this realm." *In re K.J.*, 2020-Ohio-4391, ¶ 32 (10th Dist.).

{¶ 60} Even if we focus on mother's plight, it cannot be disputed that the dispositional trial was held 221 days after the agency filed the permanent-custody motion, with mother effectively receiving a nearly six-month extension of the temporary-custody order because of the pendency of the motion for permanent custody. Mother contends that the agency gave up on her, but that ignores the fact that despite this effective extension and the agency's continued efforts to assist her, she did not avail herself of referrals and therefore made no significant progress on her case plan. Any further extension of temporary custody would have implicated R.C. 2151.415(D), which provides in pertinent part:

> The court may extend the temporary custody order of the child for a period of up to six months, if it determines at the hearing, by clear and convincing evidence, that the extension is in the best interest of the child, there has been significant progress on the case plan of the child, and there is reasonable cause to believe that the child will be reunified with one of the parents or otherwise permanently placed within the period of extension.

The juvenile court expressly rejected any further extension of temporary custody, quoting the statute and finding that it "cannot extend temporary custody in this matter." We agree with the agency that the juvenile court was not required to

continue temporary custody to give mother more time to resolve problems she has repeatedly failed to address. As one of our sister districts wrote:

> The trial court was not required to deny the children the permanency that they need, especially at such a young age, in order to provide [father] additional chances to prove that he can provide a legally secure permanent placement for the children. To deny appellee permanent custody would only prolong the children's uncertainty and instability. We do not believe that the trial court was required to experiment with the children's best interest in order to give [father] additional chances to prove that he may be able to provide them with a legally secure permanent placement at some undetermined point in the future.

*In re N.S.N.*, 2015-Ohio-2486, ¶ 50 (4th Dist.).

{¶ 61} Mother minimizes her substance-abuse problems by pointing out that marijuana and alcohol are neither illegal nor "hard drugs." Her case plan, however, required sobriety. Both mother and her younger child, T.F., tested positive for marijuana at the time of T.F.'s birth. Moreover, mother admitted to the allegations in the amended complaint, which included an allegation that her marijuana use affected her ability to provide safe and appropriate care for the children. Furthermore, it is axiomatic that the abuse of intoxicants can have devastating consequences even if those intoxicants happen to be legally obtained and used.

{¶ 62} Mother was fully aware that her case plan required sobriety. Witness Hankins testified that mother apparently had no desire to establish sobriety and further testified that on the morning of the dispositional trial, she smelled of alcohol. We agree with the agency that mother's failure to address her substance-abuse issues, including 39 missed drug tests, reflects either that the problem is beyond her

control or that she is insufficiently committed to the goal of reunification to give up her lifestyle of intoxication.

{¶ 63} As discussed above, "[w]e will not reverse a juvenile court's termination of parental rights and award of permanent custody to an agency unless the judgment is not supported by clear and convincing evidence." *In re S.H.*, 2019-Ohio-3575, at ¶ 25 (8th Dist.), citing *In re N.B.*, 2015-Ohio-314, at ¶ 48 (8th Dist.); *see also In re M.J.*, 2013-Ohio-5440, at ¶ 24 (8th Dist.). Our independent review confirms that the juvenile court's findings were supported by clear and convincing evidence presented at trial. The greater weight of the evidence established that permanent custody was supported by the statutory factors, including factors for determining the best interest of the children. Despite mother's arguments to the contrary, we cannot say that the juvenile court clearly lost its way and created such a manifest miscarriage of justice that the grant of permanent custody should be reversed. Accordingly, we find that the juvenile court's decisions granting permanent custody of the children to the agency were not against the manifest weight of the evidence and, as a logical corollary, that the agency met its burden of presenting sufficient evidence to support the granting of permanent custody. Mother's first and second assignments of error are overruled.

## B. Third Assignment of Error

{¶ 64} In her third assignment of error, mother argues that the agency was precluded from seeking permanent custody and that the juvenile court was precluded from ordering permanent custody where the agency purportedly failed to

sufficiently explore potential placements for the children. We find no merit to this assignment of error.

{¶ 65} As discussed above, the Ohio Supreme Court has held that in considering a motion for permanent custody, the juvenile court's obligations do not "include the requirement that the juvenile court find by clear and convincing evidence that no suitable relative was available for placement." *In re Schaefer*, 2006-Ohio-5513, at ¶ 64. Mother acknowledges that there is no statutory basis for an argument that the juvenile court, in ordering disposition, must consider whether a child can be placed with a relative.[8] Citing R.C. 2151.412(H)(2), the agency concedes that it has the duty to explore "extended family" as potential placement alternatives in developing case plans, but it correctly argues that this agency obligation has no effect on the trial court's ultimate authority to order children placed in the agency's permanent custody.

{¶ 66} For example, in *In re A.M.*, 2008-Ohio-4454 (8th Dist.), both the mother and the great-grandfather argued that legal custody should have been awarded to the great-grandfather as an alternative to permanent custody to the agency. This court wrote that "the language in R.C. 2151.412 is precatory rather than mandatory, and that the statute sets out general, discretionary guidelines for the court to consider when reviewing CCDCFS's development of case and reunification plans for each concerned party, and the court is not obligated to follow them." *Id.*

---

[8] Mother cites *In re S.F.*, 2013-Ohio-508, ¶ 23 (2d Dist.) ("[T]he consideration of whether a child can be placed with a relative is not a statutory requirement[,]" but is instead subsumed under the "interaction and relationship" best-interest factor.).

at ¶ 32.  As we observed in addressing mother's previous assignments of error, "a trial court 'is not required to favor a relative if, after considering all the factors, it is in the child's best interest for the agency to be granted permanent custody.'"  *Id*., quoting *In re Dylan B*., 2008-Ohio-2283, ¶ 66 (5th Dist.).  Likewise, in *In re G.M*., 2011-Ohio-4090 (8th Dist.), this court wrote that "[c]ontrary to the grandmother's assertions, the preference for a family placement as expressed in R.C. 2151.412(G)(2) is not mandatory."  *Id*. at ¶ 18.[9]  This court has elaborated on these principles as follows:

> R.C. 2151.412 applies "by its own terms to the development and review of case plans, rather than to permanent custody determinations." *In re Harris* (Nov. 2, 2000), Cuyahoga App. No. 76631, 2000 Ohio App. LEXIS 5086.  There is nothing in R.C. 2151.412 that obligates the court "to award custody to a relative rather than grant permanent custody to the agency.  In reviewing the options, the court must put the best interests of the child first." *In re Bunch* (Aug. 3, 2000), Cuyahoga App. No. 76493, 2000 Ohio App. LEXIS 3502.

*In re K.P*., 2004-Ohio-1674 (8th Dist.).

{¶ 67} In addressing mother's first and second assignments of error, we have already detailed the obstacles posed in placing the children with their maternal aunt, maternal grandmother, and MGGM.  The juvenile court explicitly found:

> No relatives have filed for or been identified in a written motion for legal custody.  The children were placed with a maternal aunt who asked for their removal due to a lack of family support.  Other relatives were investigated but ruled out.  The maternal great grandmother did not follow up with the agency and does not visit the children.  There was contradictory testimony about this visitation between the case worker and the maternal great grandmother.  The Court finds the testimony of the caseworker to be more credible on this point.  The

---

9 Because of subsequent amendments, the court's reference to R.C. 2151.412(G)(2) now corresponds to R.C. 2151.412(H)(2).

> maternal great grandmother reports that she has moved to Cleveland and is living with the maternal grandmother.
>
> . . .
>
> . . . No relative or other interested persons has filed, or has been identified in, a motion for legal custody of the child. Legal custody to a relative is not an option.

{¶ 68} Mother cites and discusses *In re S.D.*, 2013-Ohio-3535 (8th Dist.), but that decision is distinguishable. In that case, the mother had made excellent progress on her case plan, and "[t]he sole issue preventing reunification" was her "ability to find adequate housing, a completely different concern from the problem that led to the filing of the original complaints[.]" *Id.* at ¶ 21. Moreover, *In re S.D.* concerned a matter in which a "potentially viable reunification option has not been adequately explored." *Id.* at ¶ 23. In the present case, mother is arguing for placement with a relative, not for reunification.

{¶ 69} We further reject mother's contention that the agency inappropriately failed to assist MGGM in securing housing. Mother twice paraphrases caseworker Heggs, indicating she testified it was "not her job" to provide assistance to MGGM. Heggs actually testified that "as an Agency, it's not my job to assist with finding or assisting housing with people who are not a direct party of the case." (Tr. 40.) We agree with the agency that it is not required to expend its resources assisting nonparty relatives in establishing stable homes or otherwise rehabilitating them to the point they become viable candidates for placement, especially where no motion for legal custody is pending. "[T]here is no statutory obligation for the agency to work to try to rehabilitate an unsuitable relative or nonrelative before seeking

permanent custody." *In re C.S.*, 2021-Ohio-3182, ¶ 28 (9th Dist.). Mother has cited no statutory provisions or case law to the contrary.

{¶ 70} Finally, we note that while mother criticizes the agency for both moving too quickly (in her view) and not requesting legal custody to a relative, such arguments are essentially duplicative of those supporting her first and second assignments of error. The statutory period for temporary custody was about to expire, mother had made no substantial progress on her case plan, and placement with relatives was not a viable option. As explained above, mother essentially received an extension of temporary custody during the pendency of the agency's motion for permanent custody, extending temporary custody for nearly six months beyond the original deadline. She nevertheless continued to fail to make any meaningful progress on her case plan, and the agency, despite investigation, did not receive sufficient cooperation from relatives to view them as viable placement options either at the time the agency filed its motion for permanent custody or by the time of trial. Mother herself could have filed a motion for legal custody to MGGM, but failed to do so. She likewise failed to propose any case-plan amendments as permitted by R.C. 2151.412(F)(2), which provides that "[a]ny party may propose a change to a substantive part of the case plan, including, but not limited to, the child's placement[.]" *Id.* Even at the dispositional hearing, when MGGM was permitted to testify over the agency's objection, she did not state that she was interested in taking legal custody of the children and was ready to do so.

Mother's arguments find no support in the facts, the statutory framework, or case law.

**{¶ 71}** Mother's third assignment of error is overruled.

**{¶ 72}** Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court, juvenile division, to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____

DEENA R. CALABRESE, JUDGE

EILEEN T. GALLAGHER, P.J., and
MARY J. BOYLE, J., CONCUR